# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


THOMAS DOBOSZ,)
                              )
        Plaintiff,            )
                              )
        vs.                   ) No. 2:15 CV 00203
                              )
QUAKER CHEMICAL               )
CORPORATION,                  )
                              )
        Defendant.            )



        The deposition of THOMAS DOBOSZ, called by Defendant Quaker Chemical Corporation for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, at 9191 Broadway, Merrillville, Indiana, commencing at 11:57 a.m. on the 2nd day of Febuary, A.D., 2016.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

APPEARANCES:

    LAW OFFICE OF RONALD F. LAYER, P.C.
    MR. RONALD F. LAYER
    3235 45th Street
    Suite 304
    Highland, Indiana 46322
    Telephone: (219) 924-4511
    E-mail: rfl@layerlaw.com

        On behalf of the Plaintiff;


    FOX ROTHSCHILD, LLP
    MR. DAVID J. GARRAUX
    625 Liberty Avenue
    29th Floor
    Pittsburgh, Pennsylvania 15222
    Telephone: (412) 394-6585
    E-mail: dgarraux@foxrothschild.com


    QUAKER CHEMICAL CORPORATION
    MS. MICHELLE TAN-TORRES
    One Quaker Park
    901 East Hector Street
    Conshohocken, Pennsylvania 19428
    Telephone: (610) 832-7843
    E-mail: torresmi@quakerchem.com


    BURKE COSTANZA & CARBERRY
    MR. TERENCE M. AUSTGEN
    9191 Broadway
    Merrillville, Indiana 46410
    Telephone: (219) 769-1313
    E-mail: austgen@bcclegal.com


        On behalf of the Defendant.


ALSO PRESENT: Mrs. Rose Marie Dobosz


        *   *   *   *   *   *

Q.   Okay.  Just for clarity of the record, can you tell me your present legal name.

A.   Thomas Edward Dobosz.

Q.   Have you ever gone by any other names?

A.   I have not.

Q.   And what's your date of birth?

A.   ████ 1948.

Q.   And can you tell us where you were born.

A.   East Chicago, Indiana.

Q.   And so you're a US citizen?

A.   Correct.

Q.   And can you tell me your Social Security number.

████████

Q.   And have you ever been assigned any other numbers?

A.   I have not.

Q.   What is your present address?

A.   ████████████ in Wesley Chapel, Florida.

Q.   How long have you lived there?

A.   Two years and two months.

Q.   Okay.  And with whom do you live, if anyone?

A.   My wife.

Q.   Anyone else?

A.   No.

Q.   And where did you live prior to the Wesley Chapel home?

A.   Dyer, Indiana.

Q.   Okay.  And how long were you at that address?

A.   37 years.

Q.   Okay.  Did you live anywhere between the Dyer residence and the Wesley Chapel residence?

A.   No.

Q.   Okay.  Did you ever serve in the military?

A.   Yes.

Q.   What branch?

A.   Army.

Q.   How long?

A.   21 months.

Q.   And what type of discharge?

A.   Honorable.

Q.   And have you ever declared bankruptcy?

A.   No.

Q.   Mr. Dobosz, can you tell me everywhere that you've worked through 1990 through the present.

A.   1990?  I'm not sure of the name of the company, but it was at the steel mill I worked at my whole life, but they bought and sold them.  It was Youngstown, LTV, Arcelor, Lykes.  It was in the same

steel mill; I'm not sure in 1990 who owned it.

Q.   But you've always worked at the facility you've worked at through the conclusion of your employment with Quaker?

A.   Correct.

Q.   Which is currently known as ArcelorMittal's Indiana Harbor West facility, right?

A.   That's correct.

Q.   So are you telling me that you would work for different companies within the plant and you would have different employers as different companies owned or operated the steel mill?

A.   Right.   One steel mill, different owners.

Q.   And one of those would be Vulcan Oil, right?

A.   I think it was called Vulcan Chemical.   I'm not sure.   It might have been Vulcan Oil.

Q.   And are you currently working?

A.   No.

Q.   Have you worked since leaving Quaker?

A.   I have not.

Q.   And that's including any sort of independent contractor or consulting role?

A.   I have not.

Q.   Okay.   Mr. Dobosz, I'm going to introduce our first exhibit.   We'll call it Dobosz 1.   It's a 2003

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

joined Quaker?

A.   Technical service specialist 1.

Q.   And do you recall what your primary duties were as a technical service specialist 1?

A.   Testing of oil solutions.

Q.   Okay.  Anything else?

A.   On that date, that's all I did.

Q.   Okay.  Where did you -- At the time you began working for Quaker in 2003, where did you perform those duties?  Where did you go within the plant to take the chemical samples that you would, in turn, test?

A.   When I started it was tandem mill at ArcelorMittal.  Well, it was not Arcelor.  It was just -- it was Mittal Steel.  Arcelor hadn't bought into it yet.  I think.  I'm not sure on that.

Q.   Okay.  What does the tandem mill do?

A.   Reduces steel from a certain thickness to a different thickness by the customer's specifications. It makes the steel flatter and longer.

Q.   And is that where you primarily performed your duties --

A.   Yes.

Q.   -- through the conclusion of your time at Quaker?

A.   Yes.  I'm sorry, yes.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q. Okay. Where else did you perform duties for Quaker? I know that you mentioned that in 2003 your work was primarily focused in the tandem mill, but as time went on and through the, I don't know, ten years that you worked at -- you know, for Quaker, where else within Indiana Harbor West did you perform services?

A. No. 3 hot strip; No. 3 pickler; course No. 3 five-stand; No. 2 sheet metal galvanized; No. 3 two-stand they call it. It's a tandem mill, but instead of five, it had two stands. Those were the machines that I worked around because we had product for those particular devices.

Q. Okay. And for the unindoctrinated, could you tell us what those facilities or what those machines generally did? You explained the tandem mill helpfully a moment ago.

A. The two-stand tandem mill reduces steel, but it doesn't reduce it as much down. It's kind of like you take the five-stand, you make a certain gauge, and this two-stand will reduce it even more if the customer needed. The pickler is a facility that takes steel that comes out the hot strip and cleans it. The hot strip takes the slab and roles it into a coil. Pickler, tandem mill and two-stand. And the galvanized, it takes the sheet steel and coats it with

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

galvanized product.

Q. Okay. I'm going to introduce Dobosz 2. It appears to be an accident near miss investigation report from 2005.

(Dobosz Exhibit No. 2 marked as requested.)

BY MR. GARRAUX:

Q. Mr. Dobosz, if you take just a minute to review the report, please.

Mr. Dobosz, do you recall September 23rd, 2005, in which you were injured at work?

A. Yes.

Q. And this incident took place at Indiana Harbor West, right?

A. That is correct.

Q. And can you describe how you were injured?

A. I was unloading -- I'm having a truck unloaded. We ordered some product and the truck parked in this courtyard, hooked the hose up to a tank and pumped the product into a tank. And I was monitoring the fill, and there was a stairway -- and it wasn't a door, it was an opening in the wall. And then I walked in there to watch to see that the tank wouldn't overflow. And as I walked through the door, I stood up, and the door was only 64 inches high and I hit my

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

hard hat on an angle.  It was basically a hole they cut in the wall so people don't have to walk around so far to get from point A to point B.

Q.  Now, on the form it says the incident took place on the 23rd of September, 2005, and it mentions a September 27th report date.  Was there a reason that you waited the handful of days to report the incident?

A.  I didn't.  I didn't report the incident in so many days.  The report was issued then, but I reported it immediately to my supervisor.

Q.  Okay.  Who was your supervisor?

A.  At the time, Jim Hitchcock.

Q.  Okay.  And had you walked through that doorway before or that improvised doorway?

A.  Yes.

Q.  Okay.  Was there any particular reason that you hit your head that day?

A.  Don't know.

Q.  Okay.  Did you receive medical treatment as a result of the incident?

A.  Yes, I did.

Q.  Okay.  What type of medical treatment did you receive?

A.  Pain relievers, muscle relaxers, therapy.

Q.  Any surgery?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   No, but pain injections.

Q.   Okay.

A.   Or pain management injections, whatever you call them.

Q.   Like blockers or something of the sort?

A.   Whatever.  Yeah, I'm not sure.

Q.   Okay.  How long did you receive treatment for the 2005 accident?

A.   I don't know for sure.  I couldn't give you a timeframe.

Q.   Do you remember what doctors you saw?

A.   The physicians that were at Concentra, and I don't know the name of the doctors there.  That was a long time ago.  I went to a pain management clinic and a Dr. Cane treated me and I don't know -- I might have seen another doctor, but I don't remember his or her name.

Q.   Okay.  Do you recall what medications you were prescribed?

A.   It was -- Some of it was over-the-counter medications like Tylenol or ibuprofen.  I think they might have given me an ice pack, but I'm not sure.  That was it as far as -- as far as I can remember.

Q.   Okay.  We're going to introduce Dobosz 3. It's a report from APAC Groupe Centers for Pain

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Management.  If you can take a minute and review that, Mr. Dobosz, and let me know if you've ever seen this document before.

(Dobosz Exhibit No. 3 marked as requested.)

BY THE WITNESS:

A.  Yes, I have.

Q.  Okay.  And you would agree with me that this report was prepared by a Dr. Taha, T A H A, Jamil, J A M I L, correct?

A.  That's what it says here, yes.

Q.  Okay.  Now, did Dr. Jamil treat you in connection with your injury or did Dr. Jamil assess you in connection with a level of partial permanent impairment associated with the workers' comp claim?

A.  He was the doctor that assessed me.

Q.  And if I refer to partial permanent impairment and call it PPI, you'll know that's what I'm talking about?

A.  Uh-huh.  Yes, sir, I'm sorry.

Q.  So you never treated with Dr. Jamil?

A.  No, he didn't actually treat me.  Other physicians did.  He was the one that like gave me my final evaluation report, whatever.

Q.  For workers' comp purposes?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

supposed to have a 4 percent permanent partial impairment of the whole body, right?

A.  Yes.

Q.  Do you remember how much time you missed, if any, as a result of the September 2005 injury?

A.  Maybe less than three days.

Q.  Okay.  And do you recall when you returned to full-duty status?

A.  I was working the whole time I was under treatment.

Q.  Okay.  And did you request any accommodations from Quaker in connection with the 2005 injury?

A.  Somebody had to cover my job when I was having treatment or therapy.

Q.  Any others?

A.  No.

Q.  Okay.  And did Quaker cover your position while you were out receiving treatment?

A.  Yes.

Q.  So they fully accommodated your -- any accommodation you required?

A.  Well, they accommodated the customer because I wasn't there.  So if I was having a pain shot -- I had some pain shots and when I wasn't there, they did my job.  Somebody did my job.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

comp claim against any other employer?

    A.  No.

    Q.  Okay.  So we're going to introduce Dobosz 7, Which is a letter dated March 3rd, 2008, identifying what I understand to be a promotion at Quaker.  If you take a look at this, please, and just let me know if you've seen the document in the past.

                    (Dobosz Exhibit No. 7 marked as

                        requested.)

BY THE WITNESS:

    A.  I have.

    Q.  And you recall signing the letter at the bottom?

    A.  I recall.

    Q.  And you were promoted to the role of site engineer 1, right?

    A.  Correct.

    Q.  And what was the difference between site engineer 1 and your prior role with Quaker?

    A.  More responsibilities.

    Q.  And what was the difference in responsibilities?  What did you do now that you didn't do before?

    A.  What I told you, those facilities that I maintained, I was responsible for inventory, solution

Q.   Which among these duties would you assert aren't part of your regular responsibilities?

A.   I'm not asserting that they weren't -- I wasn't allowed to do these things.

Q.   What weren't you allowed to do?

A.   Inspect, monitor and maintain coolant filters. Inspect routine maintenance of fluid system filter changes, empty and cleaning sump pumps with no guidance from the staff.

Q.   Okay.

A.   I wouldn't do that.

Q.   Anything else?

A.   I think everything else is pretty much what I did.

Q.   Okay.  Would you agree with me the specific daily functions at a given Quaker site, whether it be Indiana Harbor West or for a U.S. Steel client or automotive client or whatever, are governed by a service level agreement?

A.   I don't know that because I was never involved in a service level agreement.  I never seen what they negotiated with the customer as far as service.

Q.   Okay.  I'm going to introduce Dobosz 9.  It's a copy of the ArcelorMittal service agreement for Indiana Harbor West.

(Dobosz Exhibit No. 9 marked as

requested.)

BY MR. GARRAUX:

Q.   Mr. Dobosz, I'll represent to you that this is the service level agreement in place between Quaker and ArcelorMittal for service at the Indiana Harbor West facility.  If you take a minute to review the document. Once you're done reviewing it, let me know if you'd agree that you completed the tasks identified in the agreement.

A.   I did this stuff, but I didn't do it every day and every week because it just didn't work that way.

Q.   Can you explain?

A.   If the mill wasn't running, you didn't do certain things.  If the mill broke down, you couldn't do certain things.  So if the mill was running you could do a lot of these things, but if the mill was not functioning, you couldn't do stuff.

Q.   So you would adjust your daily duties consistent with the operational needs of the facility, right?

A.   Yeah.  Yes, I mean.

Q.   See on the first page, the agreement calls for Quaker to report and manage oil usage per ton performance, and for Quaker to manage inventory.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Do you see that?

A.    Where at exactly are you talking about?

Q.    Sure.  It's sort of in the middle of the page.

A.    Where?  Point to it, please.  Okay.  Yes, I see that.

Q.    And how would you do that?

A.    I would report -- I would monitor how much oil they used and how much tonnage they produced to make a report to say you're producing X amount of tons per so many gallons of oil.

Q.    Okay.  And you managed inventory, right?

A.    Monitored inventory and managed it, yes.

Q.    Okay.  And how do you do that?

A.    Check tank levels, monitor meters to see how much water, oil is being used from a day-to-day basis so I know how much they're putting in the tank so I know how much to order when -- so they don't run out.

Q.    And so you needed to access gauges on the various pieces of equipment to do that, right?

A.    Yes.

Q.    And did you ever use dip sticks to dip into tanks as a way of monitoring the amount?

A.    Yes.

Q.    And you dip that in at the top of the tank, right?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   Right.

Q.   You have to climb a ladder to do that?

A.   I did.

Q.   It's one of those tanks where you'd have to climb a ladder to check the levels on the rolling oil tanks?

A.   Yes.

Q.   And how many rolling oil tanks were there?

A.   Two.

Q.   Did you have to climb a ladder to check any other tanks?

A.   I can't remember.  I don't think I did.

Q.   Okay.  So would you get shipments of oils and chemicals for use at the facility?

A.   Yes.

Q.   Okay.  And how were those shipments stored?

A.   Plastic totes, metal tanks.

Q.   Now, a plastic tote is a lot smaller than a metal tank, right?

A.   Yes.

Q.   Okay.  And a plastic tote, as I understand it, would be somewhere in the neighborhood of, you know, 300 gallons, looks somewhat like a water buffalo; is that a fair assessment?

A.   It's usually 250 to 275.  I've never seen one

300.

Q.   Okay.  But 250 to 275 gallons?

A.   Yes.

Q.   Okay.  About how tall?

A.   Four feet.

Q.   And you fill them at the top, right?

A.   Well, yes and no.  Sometimes I would, sometimes I'd let gravity feed them from the bottom.

Q.   Okay.  So occasionally you'd filled them -- Where was the receptacle?  How did you hook a hose up to fill up a tote?

A.   It would be on the top.

Q.   Okay.  And then how could you fill them from the bottom otherwise?  Was there another valve at the bottom?

A.   Yeah, where it discharges you can put that hose into the bottom of a bigger tank and it would feed it backwards.

Q.   And were you responsible for refilling both tanks and totes?

A.   Yes.

Q.   And you mentioned that sometimes you'd do it from the top, sometimes you'd do it from the bottom, but would you use hoses to fill these up?

A.   Yes.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q. And where would you fill them up from?  So the tank or the tote is empty; how would you fill it?

A. From a truck.

Q. Okay.  And so you'd take a hose from the truck to the tank or the tote and fill up whatever needed filled, right?

A. No.

Q. Okay.  What do you mean?

A. If the truck hooks up -- The truck driver would hook his hose to a pipe and pump it in with air pressure into the tank.

Q. Okay.  What about the totes?

A. He would take -- The driver would take a hose from his truck, pressurize his tank and put it in the tote.

Q. So you weren't responsible for that?

A. The truck drivers are.

Q. You never filled a tote?

A. I did.

Q. How often did you fill totes?

A. As they needed it when we ran out.

Q. Okay.

A. I don't know.  It could have been every week, could have been once a month.

Q. Okay.

A.   If the mill wasn't running, they didn't use product, didn't need to order it, didn't fill it.

Q.   How many totes would you fill a month on average?

A.   Depends.

Q.   Depends on what?

A.   Type of product.

Q.   How many -- On average -- Fine.

On average, how many totes did you fill per month of all product, all fluids?

A.   I don't know because it varied.  I couldn't give you an average because it would vary.  Sometimes the mill would be down for two weeks, wouldn't fill nothing.  Sometimes they'd run heavy and they'd fill more.  Couldn't tell you.  I couldn't give you an average because there -- it changes.

Q.   Okay.  What would be a heavy month?

A.   I don't know that.  You'd have to ask Shawn Rue or somebody like that that does all the ordering and stuff.

Q.   But Shawn wasn't in the plant with you routinely, right?

A.   He was there about every day.

Q.   Uh-huh.  But it wasn't his job duty to fill the totes, was it?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q.   How fast would you run through these gallons of water?

A.   Depends how many tests I had to do and if the mill was running.  I don't remember exactly how much distilled water I used, but I had to use distilled water.  I couldn't use tap water.

Q.   The agreement here requires Quaker to sample and test oil and hydraulic fluids routinely, right?

A.   Yes.

Q.   So sampling and testing oil and fluids was a big part of your job, right?

A.   Yes, sir.

Q.   And I think you mentioned earlier all the pieces of equipment where you pulled samples, right, when you mentioned the pickle line, the galvanized line, the five-stand, the two-stand, right?

A.   Yes, sir.

Q.   Okay.  Who did you work with most closely during your time at Quaker?

A.   Shawn Rue.

Q.   Do you remember his title?

A.   Oh, jeez.  I don't remember his exact -- product service manager.  I could be wrong on that.  I didn't know for sure.

Q.   Did you view him as a supervisor?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.  My -- It was his account, so I did whatever he told me to do at his account.

Q.  Okay.  Anybody else that you worked closely with while you were at the facility?  You mentioned Brad Wellensiek.

A.  Brad Wellensiek was like a product manager, I think.  I'm not sure on his title.  He would come and go.  Sometimes I'd see him a couple times a week, sometimes I wouldn't see him for three weeks because he'd be traveling and he would tell me that -- to do certain things.  But he wasn't my immediate supervisor. He was a different title that worked within the whole steel group.

Q.  Got it.  And how often did you see Craig Hladik, H L A D I K?

A.  Maybe -- Maybe, at the most, four times a year.

Q.  Okay.  You talked about totes a little bit earlier.  How would those totes and drums be moved in the facility?

A.  Forklift, crane.

Q.  And ArcelorMittal would take care of moving them?

A.  Yes, sir.

Q.  Do you know how much they weighed?

A. No.

Q. Okay. And we mentioned sort of in loose terms, you know, what was in them, chemicals and oil. Is there anything else that was in there? I guess there was hydraulic oil or hydraulic fluid and oil, lubricant. Was there anything else?

A. Cleaners, detergents. Yeah. Detergents.

Q. So we're going to introduce Dobosz 10. It's a copy of the accident near miss investigation report from 2012.

(Dobosz Exhibit No. 10 marked as requested.)

BY MR. GARRAUX:

Q. Mr. Dobosz, once you've had a chance to take a look at this, let me know if you've seen it before.

A. Uh-huh. Okay.

Q. So the report says on the first page, quote, "I was going down the stairs after obtaining water meter readings from the top of the solution tank. I slipped on the way down on the stairway. The stair was broken, as the tread had separated from the step. I was holding onto the handrail and landed on my butt," end quote.

Now, is this an accurate description of the incident leading to your 2012 workers' comp claim?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   It looks like I sent that, yes.

Q.   Okay.  So the E-mail reads as follows:  Quote, "Craig, I discovered that the reason I slipped on the stairs from the west solution tank at ArcelorMittal west tandem mill, the step was defective.  I slipped again this morning, but did not fall.  I have a picture of the problem and reported it to the roller.  They put in a work order to have two steps replaced and closed stairway.  I reported it to you and Brian Hylek.  He asked me if I needed medical attention.  I said I did not.  I bumped my right arm holding onto the handrail and slipped and fell on my butt.  I am still sore in my calf area on both legs and also sore on the neck, shoulders and arms.  I will send you the picture of the stair.  I am having trouble sending E-mail of the stairs on Sprint, Tom," end quote.

Do you agree that's what it says?

A.   That's what you read.

Q.   Is that what the document says?

A.   Yeah, that's what the document says.

Q.   And you mentioned that you discovered the reason you slipped on the stairs, right?

A.   Yes.

Q.   But this reflects this it was sent on April 25th, 2012, right?

worked Monday to Friday if the mill worked Monday to Friday.  If the mill worked Sunday to Saturday, I worked Sunday to Saturday.  I worked when the mill worked.

Q.  But you'd typically work a five-day week?

A.  I worked five days, sometimes I worked six, sometimes I worked seven.

Q.  Over the last two to three years of your time at Quaker, would you typically work Monday through Friday?

A.  Yes.

Q.  So did you report to work, if you recall, on Monday, April 23rd?

A.  I believe I did.

Q.  Were you in pain?

A.  Yes.

Q.  Okay.  Did you report to work on Tuesday the 24th?

A.  I believe I did.

Q.  And were you still in pain?

A.  Yes.

Q.  Okay.  Mr. Dobosz, it's my understanding you've sued ArcelorMittal in connection with the slip and fall in the tandem mill; is that correct?

A.  Yes.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

MR. GARRAUX:  That's fine.

BY MR. GARRAUX:

Q.  Was there a workmen's comp claim in connection with the April 2012 accident?

A.  Yes.

Q.  Okay.  I'm going to introduce Dobosz 12, August 2012 letter excusing your attendance at Quaker, I believe while you were getting physical therapy.  If you take a look and let me know if you'd agree that you've seen this document before.

(Dobosz Exhibit No. 12 marked as requested.)

BY THE WITNESS:

A.  No, I have not seen this document.

Q.  Okay.  Would you agree with me that you received extensive physical therapy through Accelerated Rehabilitation Centers?

A.  Yes.

Q.  And about how often a week did you go, do you remember?

A.  Usually two or three times a week.

Q.  Okay.  Did you see a particular physical therapist when you were there?

A.  Well, there was a gentleman that was a manager and he would assign me to different physical

Thomas Dobosz                      Dobosz vs. Quaker Chemical Corporation

therapists, depending on who was working that day and who was off.

Q. Okay. Was there one that you saw more frequently than another?

A. No.

Q. Okay. You were always honest with Accelerated Rehab with respect to your capabilities and the physical requirements of your job, right?

A. Yes.

Q. And can you remind me what your regular hours were at Quaker?

A. It -- I didn't have regular hours. I was there -- I would come in sometimes -- Depends if a truck was there early. I would come in at 6:00, sometimes I'd come at 7:00, sometimes I'd come in at 6:30. You know, I was usually there by 7:00 everyday, but if a truck was there at 6:00 o'clock, I was there at 6:00 o'clock.

Q. Typically you started at 7:00?

A. Right.

Q. You would adjust your schedule depending upon any operational considerations that day, right?

A. Sounds right.

Q. And was there a time of day that you were typically done? Would you be done by 3:00, again,

Thomas Dobosz                Dobosz vs. Quaker Chemical Corporation

subject to any operational --

A. 3:00 to 4:00.

Q. -- considerations?

A. 3:00 to 4:00, depending on the mill.

Q. Okay. Now, I see that a lot of your PT appointments that were excused were at 1:00 p.m. Is there any reason those weren't scheduled during non-working hours?

A. No, I don't have any, you know --

Q. Okay.

A. They weren't open, you know, all night. They closed at a certain time.

Q. Do you remember when they closed?

A. No.

Q. So Quaker's responsibility's at Indiana Harbor West continued, of course, while you out at these appointments, right?

A. Correct.

Q. Do you remember who covered your duties when you were out at the PT appointments?

A. Brad Wellensiek, Shawn Rue, Sudeep Saxena until he resigned.

Q. Okay. And Quaker was cooperative with you attending all of these PT appointments?

A. They never said -- gave me any issues.

Thomas Dobosz                Dobosz vs. Quaker Chemical Corporation

Q.    And you received the E-mail?

A.    Yes.

Q.    And I think you testified earlier that you had made people aware that you had limitations, right?

A.    Yes.

Q.    Did you -- Once you read this E-mail, did you contest to anybody at Quaker, did you let them know that you had limitations?

A.    They knew it.  I told people.  They knew it.

Q.    Did you respond to this E-mail?

A.    No, because I could see where it was coming from, Mr. Hladik.  Mr. Hladik, after our conversation, sent this E-mail.  And the reason he's sending this E-mail, because somebody at Quaker -- I'm sorry, somebody at ArcelorMittal says they need their tests. Well, you also have to remember in this timeframe I was the only one there.  It's a one-man show.  Across the canal there's two people working there.  Here I'm a one-man show.  Sudeep Saxena resigned.  They didn't replace Sudeep Saxena to take over anything I do. Mr. Shawn Rue and Mr. Brad Wellensiek had other places to be and other responsibilities.  I was the only guy in town in this facility.

Q.    You said you're the only guy in town, but didn't you tell us a moment ago that Shawn Rue and Brad

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

there, the door would freeze.  Because we were right near Lake Michigan.

Q.  Right.  And so back to the E-mail.  Craig says he's not aware of any limitations, you didn't call Craig for the reasons that you've explained.  Did you call anybody else?

A.  Who am I going to call?

Q.  Could you have called Michelle Carter?

A.  Apparently Michelle Carter knew about this because her name is on here.

Q.  Right.  Did you think that this was accurate?

A.  No.

Q.  Why didn't you call anybody?

A.  I don't know.

Q.  Okay.  I'm going to introduce Dobosz 14.  It's a functional progress note from Accelerated Rehab.  Mr. Dobosz, if you take a minute and review that, please.  Let me know if you've seen that in the past.

                    (Dobosz Exhibit No. 14 marked as

                        requested.)

BY THE WITNESS:

A.  I don't remember seeing this.

Q.  Okay.  But you would agree with me that it was prepared by Accelerated Rehab?

A.  Yes.

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

Q.   Okay.   I think before our break you mentioned you were always candid with Accelerated Rehab, right?

A.   I did?

Q.   I believe so.

A.   Okay.

Q.   Okay.   Well, I'll ask it again.

Were you always candid with Accelerated Rehab?

A.   Well, yeah, I was.

Q.   You always tried, you know, to your utmost ability whenever you were asked to lift things, pull things, whatever they asked you to do?

A.   Yes, yes.

Q.   Looking on the first page under a sub heading called client, slash, occupation physical demand level, second line down it says, "It should be noted that this client's job as a site engineer," all caps, "as described by the client," end all caps, "is classified within the medium-heavy physical demand level based on two-hand occasional lift of 50 pounds floor to waist, two-hand occasional overhead lift of 50 pounds and pulling forces of 75" -- I believe it's "HFP," end quote.

You agree that's what it says?

A.   Yes.

Q.   And did you tell Accelerated what you had to

Thomas Dobosz                Dobosz vs. Quaker Chemical Corporation

do as part of your job responsibilities as a site

engineer?

    A.   I told them what my job responsibilities were.

    Q.   Okay.  So if you turn to the bottom of page 2,

please.

    MR. LAYER:  Excuse me.

    MR. GARRAUX:  Sure.

    MR. LAYER:  I'm not sure -- Did you ask him

whether he told them that or what he told them?

    MR. GARRAUX:  No, no.  And that's a fair

clarification, Counsel.

    MR. LAYER:  Yeah.

BY MR. GARRAUX:

    Q.   Did you explain -- As part of your course of

treatment with Accelerated Rehab, did you generally

describe your routine regular functions at Quaker

Chemical?

    A.   Yes.

    Q.   Okay.  So turning to the second page, starting

at the very bottom, it reads, quote, "The client

reports his work primarily involves moving liquids with

occasional two-hand lifting of charged two- to

three-inch hoses from floor to various heights,

including overhead, to pump liquids into various tanks.

He reports the hoses are fairly heavy and he estimates

Q. Okay. I'd like to direct your attention to the second paragraph of this E-mail from Florence to Liberty Mutual. Actually, I'm sorry, it's from Liberty Mutual back to Florence. It's Florence's E-mail at the top. It says, quote, "The nurse case manager also spoke with the physical therapist. He has been released from physical therapy. He stated that the claimant has made comments that he does not wish to return to work," end quote.

Do you see that?

A. Yes, I do.

Q. Do you recall making any statements to any of your physical therapists that you didn't wish to return to work?

A. I do not remember making that statement.

Q. Did you want to return to work at that time?

A. Yes, I did. I had all intentions of coming back to work. In fact, the physical therapist that worked on me at Lakeshore Bone & Joint told me, "You will go back to work."

Q. Okay. Well, outside of whatever they told you, was it your intention to go back to work?

A. Absolutely. I intended to work.

Q. And had you purchased a home in Florida at that point?

A.  Yes.

Q.  Wasn't that viewed as a retirement home?

A.  A home.  I don't know if it would be retirement.  We'd be living somewhere.

Q.  Were you planning on keeping an Indiana residence and a Florida residence?

A.  Until I quit working.

Q.  And how long did you expect that to be?

A.  Oh, a couple of years.

Q.  How many?

A.  Don't know.  Depends.

Q.  Would you still be working now?

A.  If I had the opportunity I would be.

Q.  Even with the house in Florida?

A.  Yes.  I intended to go back to work after I was -- after all this surgery and I was fixed.  I had no intention of retiring.  I wanted to go back to work.

Q.  Okay.  Introduce Dobosz 16.  It's a copy of a physical demands analysis.  Take a minute, if you would, and review it and let me know if you've seen this document in the past.

                    (Dobosz Exhibit No. 16 marked as

                     requested.)

BY THE WITNESS:

A.  Okay.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q.   Do you remember seeing this document before?

A.   No, I don't.

Q.   Okay.  Do you agree that your electronic signature is reflected at the end?

MR. LAYER:  Object to that; no foundation.

BY MR. GARRAUX:

Q.   Do you agree with me on the last page, next to the line that says "associate," it says "Tom Dobosz" over the top of where it says "sign name"?

A.   Yes, I see that name.

Q.   Okay.  So let's look at the first page under job duties.  It's sort of top third of the first page.

We talked more generally under the site engineer 1 job description that we looked at earlier today about, you know, generally what your duties were.  You agreed most of them were your duties; there were a few exceptions with respect to maintenance of equipment, which you were saying was largely in the wheel house of ArcelorMittal.

Do you agree that the job duties reflected on this exhibit accurately reflect your daily work at Indiana Harbor West?

MR. LAYER:  You're saying on all six pages?

MR. GARRAUX:  I'm referring to just under --

MR. LAYER:  Excuse me.  Are you saying all six

Thomas Dobosz                                    Dobosz vs. Quaker Chemical Corporation

Q. What else did you do? You're saying it's incomplete. What else did you do?

A. I did daily reporting, not just monthly reporting. I went for lunch, bought lunches, bought breakfast. Anything -- Anything that needed to be done. Pull steel samples. There's a lot of things in here I did that's not on this one paragraph.

Q. Okay. You said pulling steel samples. What -- Can you describe that?

A. I'd get a sheet of steel from the mill and take it from the mill into my trailer and I'd wash it down with solvents and send those samples in for testing.

Q. Why would you do that?

A. Because we had to determine how much oil was on a strip of steel.

Q. Which had to do with oil consumption in the plant, is that the general idea behind it?

A. Yes. And how much dirt was on the strip also.

Q. And would you use different samples of steel, different types of steel?

A. Yes.

Q. Different thicknesses?

A. Yes.

Q. And how heavy were those pieces of steel?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q. Okay. Is there anything else that immediately stood out to you in reviewing the document?

A. No, there's nothing immediate, but I haven't gone over it real thoroughly.

Q. Okay. Let's go back to the first page, addresses physical activity. A(1), the analysis states that 20 percent of your workday was committed to ascending or descending ladders, stairs, scaffolding, ramps and polies, P O L I E S?

A. Poles, P O L E S.

Q. Bad typing. We mentioned that there were ladders that had to be climbed in the facility. Can you tell me where those ladders were, other than I think we talked about two up to the rolling oil tanks?

A. None.

Q. So it's only the two up to the rolling oil tanks?

A. Right.

Q. Okay. Any other instances in which you would need to pull yourself up onto a tank, platform, et cetera?

A. No.

Q. Okay. And how high were the ladders up to the rolling oil tanks?

A. Oh, I don't know. 15 feet, I guess. 12 feet.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

didn't have to do some of these physical requirements, you didn't have to exert up to 50 pounds of force occasionally or up to 30 pounds of force frequently and or up to 20 pounds of force constantly to move objects, right?

A.  Right.

Q.  Now, I'm backing up to the Accelerated Rehab report.  Okay?

A.  Which document was that?

MR. LAYER:  Excuse me.  I don't mean to be picky, but didn't you just misread what the document -- what are you reading, B(3)?

MR. GARRAUX:  B(3).

MR. LAYER:  You just said up to 20 pounds constantly.  It's 10.

MR. GARRAUX:  10.  If I read incorrectly, I apologize, and let the record reflect the clarification.

BY MR. GARRAUX:

Q.  It's Dobosz 14, I believe.

A.  Okay.  I've got it in front of me.

Q.  Okay.  I guess my question is if you're claiming that this assessment of the physical demands in Dobosz 16 is inaccurate, do you know why it says that you would have to pull these heavy hoses as part

Q.   Uh-huh.   Do you deny that's what you had to do?

A.   I don't know if they were 50 pounds, but I estimated.

Q.   Okay.   All right.   Now, did you continue to work while you were receiving physical therapy in connection with the April 2012 fall?

A.   Yes.

Q.   Okay.   And at some point you had a surgical procedure, right?

A.   Yes, sir.

Q.   And you told us it was a fusion?

A.   Yes, sir.

Q.   Do you remember when that happened?

A.   October of '12.

Q.   And I think you said that that was Dr. Nenadovich?

A.   Nenadovich.

Q.   There's Dobosz 17, February 2013 Lakeshore work status report.   Exhibit 17.

                    (Dobosz Exhibit No. 17 marked as

                    requested.)

BY MR. GARRAUX:

Q.   This particular page is just the form, not the relevant report.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Mr. Dobosz, do you recall seeing this document from Lakeshore Bone & Joint Institute before?

A.  Not sure if I've seen this document, but I'm looking at it now.

Q.  Okay.  And you see next to activity status, the report says, quote, "Work status:  No lifting, pushing, pulling greater than 10 pounds.  No overhead work.  No wearing of a hard hat.  Is not at a point where he can risk hitting his head on overhead objects, even with a hard hat on.  Even though he can work in a trailer, he has to put a hard hat on to go into the mill to use the restroom, where he's likely to hit his head on overlying structures," period.  "According to the patient, this happens all the time," period.  I think this would be contraindicated with his next surgery in not having reached MMI yet," period, end quote.

Do you see that, Mr. Dobosz?

A.  Yes, I do.

Q.  And you would agree that MMI is maximum medical improvement?

A.  If that's what you say it means, yes.

Q.  Okay.  So as of February of 2013, Dr. Nenadovich didn't want you in the mill to risk hitting your head, right?

A.   That's correct.

Q.   Okay.   And that's because you were still healing from the cervical fusion, right?

A.   If that's what Dr. Nenadovich says, yes.

Q.   And, of course, you need to go into the mill to collect chemical samples, right?

A.   That's correct.

Q.   And so at that time you weren't able to work?

A.   That's correct.

Q.   And did you continue to be paid by Quaker during this time?

A.   Yes.

Q.   Okay.   And you didn't request any accommodations at this point, right?

A.   As far as what?

Q.   Being able to return at some point, whether or not it was working in the trailer, et cetera?

A.   I let the doctor decide that.

Q.   Okay.   Here's Dobosz 18, April 2013 report from Lakeshore.

(Dobosz Exhibit No. 18 marked as requested.)

BY MR. GARRAUX:

Q.   Take your time to review the exhibit, Mr. Dobosz.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

is accurate?

A. Yes, I do.

Q. Okay. Let's turn to the last page of the exhibit. It says, quote, "Permanent restrictions: No lifting, pushing, pulling greater than 30 pounds frequently, greater than 30 pounds occasionally. No overhead work," period.

You agree that's what it says?

A. Yes, sir.

Q. Okay. And did you continue to visit Lakeshore after June of 2013?

A. No.

Q. Okay. And did you understand that Lakeshore had determined that you were at maximum medical improvement or MMI?

A. I assumed that's what that means.

Q. Okay.

A. Okay.

Q. So what did you do after you were released in June of 2013 and stopped going to Lakeshore? Did you contact Quaker?

A. I let -- I thought all these insurance companies would tell Quaker I'm done, I'm released.

Q. Okay. So you didn't contact Quaker yourself?

A. I don't believe so.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.  That's correct.

Q.  Okay.  But you don't know why they wouldn't be accurate?

MR. LAYER:  You mean other than the fact that medical records have inaccurate inadequacies all the time?  Other than that?

MR. GARRAUX:  Who's testifying here?

MR. LAYER:  I just thought I'd add that for a little lightness.

MR. GARRAUX:  Unnecessary.

BY THE WITNESS:

A.  Can you ask that question again?

(Record read as requested.)

BY THE WITNESS:

A.  I don't know why they wouldn't be accurate.

Q.  Okay.  So after June of 2013, you're released to work, you have your permanent restrictions from Dr. Nenadovich.

Did you ever request an accommodation from Quaker?

A.  No, I just thought they'd have this report and see what the doctor said.

Q.  Okay.  But you didn't E-mail anybody?

A.  I don't believe so.

Q.  Didn't call anybody?

BY THE WITNESS:

A.   That means I was getting that much money for what happened to me.

Q.   Okay.  And would you agree that this was additional impairment beyond the 4 percent impairment that you had in connection with the first workers' comp case?

A.   That's what Dr. Nenadovich said.

Q.   And do you remember what percentage of permanent partial impairment he rated you at?

A.   7.

Q.   Okay.  Did you receive any additional medical care related to this injury?

A.   When?

Q.   Since the date of the settlement, September of '13.

A.   No.

Q.   Okay.  It's your contention that after June of '13, you were released and capable of returning to your job, right?

A.   I had every intention of going back to work.

Q.   Okay.  And you were physically able to do that, right?

A.   Go back to work, yes.

Q.   Did you file a claim with Social Security

disability claiming that you were too injured to work?

A. No.

Q. You never filed a claim for Social Security disability?

A. Nope. Alsip did.

Q. Alsip?

A. It's a company hired by Prudential to file it for me.

Q. So you didn't file that?

A. Alsip did.

Q. Okay. Let's go to Dobosz 21. It's a letter from Quaker Chemical to you, Mr. Dobosz, dated August 7th, 2013. Please let me know if you've gone ahead and seen this before.

A. Number 20 or 21?

Q. 21.

A. Thank you.

                    (Dobosz Exhibit No. 21 marked as

                         requested.)

BY THE WITNESS:

A. Yes, I've seen this.

Q. Okay. And at this point, August 7th of '13, you hadn't yet returned from surgery, right?

A. That's correct.

Q. And to that point you'd still been paid by

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Quaker, right?

A.   That's correct.

Q.   Okay.  And would you agree that the restrictions identified in the letter in the two bullet points reflect what Dr. Nenadovich listed as your permanent restrictions?

MR. LAYER:  It's on the last page there.

THE WITNESS:  On this one?

MR. LAYER:  Yeah.

THE WITNESS:  Yeah, that's what I'm looking for.

BY THE WITNESS:

A.   Yes.

Q.   Okay.  And would you agree with me that the letter, Exhibit 21, confirms Quaker's understanding that the limitations imposed by your doctor preclude you from continuing in your role as site engineer 1?

A.   That's what Quaker alleges.

Q.   All right.  And would you agree with me that the letter also says that Quaker reviewed other current job openings within the company but wasn't able to find any opportunities for which you were qualified?

A.   That's what the letter says.

Q.   Any reason to think that that's not true?

A.   I don't know.

Q.   And would you agree with me that the letter

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

invites you to contact the company if there were any changes to your work restrictions or if there were any alternatives that you wanted the company to consider, right?

A.  If there were any changes in my work conditions, right, or alternatives.  Yes, that's what the letter says.

Q.  So did you contact anybody at Quaker after seeing this letter?

A.  It's pretty obvious here that they couldn't find a job for me.  So I called, but nobody wanted to do anything but get rid of me.

Q.  Who did you call?

A.  I thought I called Michelle Carter.

Q.  And do you remember what you said to Miss Carter?

A.  No, I don't.

Q.  Did you call anybody else?

A.  No, because it was her name on the letter. The fact that people that I worked with didn't even know I got terminated.

Q.  Uh-huh.  And who were the people you worked with?

A.  Shawn Rue, Brad Wellensiek.

Q.  So was the injury from April of 2012 the same

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

injury that you had in 2005?

A.   No.

Q.   They're different injuries, right?

A.   Yes.

Q.   And different treatments afterwards, right?

A.   Yes.

Q.   Okay.  So I think you testified that you remember contacting Miss Carter; you don't remember what you told Miss Carter, right?

A.   No, I wasn't really happy when I got this letter.

Q.   Do you recall what you told her?

A.   No.

Q.   Okay.  Do you recall requesting any form of accommodation from Quaker?

A.   I don't remember.

Q.   Okay.  Any reason to think that you did?

A.   I don't remember.

Q.   Okay.  And this letter gave you 30 days' notice that unless Quaker heard from you otherwise, that you would be let go on September 5th of '13, right?

A.   I guess I never got a termination letter in my life.

Q.   Right.  But was this letter giving you 30

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

A.   Okay.

Q.   Is that right?

A.   Pardon me?

Q.   Is that right, that you had a question regarding the payout of your unused vacation?

A.   Yeah, yes, that's right.

Q.   And this E-mail suggests that the conversation took place on or about August 16th, 2013, right?

A.   Yes.

Q.   And is that about when you recall the conversation taking place?

A.   Not sure.  It says it in the paper.

Q.   Was it -- To your recollection, was it the days following your receipt of the August 7th letter?

A.   Yes, it was.

Q.   Okay.  Now, I think you testified earlier that you wanted to return to work, right?

A.   Yes.

Q.   Now, if you wanted to come back to work, why were you asking the benefits manager about payout of your unused vacation?

A.   Because Quaker wasn't going to return me to work.  I wanted to, but it states right here in my termination they are unable to find any jobs within Quaker Chemical, "to identify any current openings we

doesn't say that.  There's two different places that it's talking about --

MR. GARRAUX:  Mr. Layer, you've testified for your witness like five times today.  Enough is enough.

MR. LAYER:  I'm making an objection.

MR. GARRAUX:  You're making a lengthy, verbose speaking objection.  If you want to object to the question I'll reformat it, we'll read it back, we'll see if it's appropriate.  Okay?

MR. LAYER:  Sure.

BY MR. GARRAUX:

Q.  All right.  So just for clarity of the record since we've had a little bit of back and forth here, do you agree with me on the first page that it offers you -- that you are offered the opportunity to reach out to Quaker if there are any alternatives that Quaker has not considered that would allow you to return to work?

A.  That's what it says.

Q.  And you would also agree with me that on the second page you're invited to contact Michelle Carter if you had any questions?

A.  Where does it say that on the second page? Doesn't say advise, it just says if you have further questions.  It doesn't say invited to call me.  It

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

A.  I would work anywhere.  They did the same thing I did across the street.

Q.  At Indiana Harbor East?

A.  And they did the same job in New Carlisle.

Q.  Were there other people currently staffing those positions?

A.  Yes.

Q.  Is it your contention that they should have laid them off and hired you instead?

A.  I don't tell them what to do, but there were younger people doing the same jobs on the other side and two people on the other side when I was only by myself on the other side.

Q.  What did Michelle Carter say?

A.  No.

Q.  She said no?

A.  She didn't respond.  I didn't hear anything.

Q.  She didn't -- So you called her, you asked her these things and she didn't say anything?

A.  She didn't say I could go work on the east side, I could go work in New Carlisle, didn't do anything.

Q.  She may not have agreed to what you're saying that you asked for, but what did she say in response?

A.  I don't remember.

Thomas Dobosz                              Dobosz vs. Quaker Chemical Corporation

A.   In -- No.

Q.   I'm sorry.  Did you return to Dyer, Indiana to attend the closing?

A.   Yes.  Well, no, I wasn't in Dyer, Indiana.

Q.   Okay.  Where were you?

A.   I was en route to Florida.

Q.   Okay.  And so your wife attended the closing, right?

A.   That's correct.

Q.   Where were you living at the time of the closing?

A.   102 Potomac Drive, until we sold the house.

Q.   So you lived in the home in Indiana until you sold it?

A.   Yes.

Q.   Okay.  Do you remember when you first put this home on the market?

A.   No, I don't.  But it was after I lost my job.

Q.   So it was after August of 2013?

A.   After, yes.

Q.   Okay.  And do you remember what real estate agency you used?

A.   It was one of those byowner.com things.

Q.   And so there was an Internet posting, I guess, right?

A.   I'm sure I have it someplace.

Q.   Okay.  But prior to whenever it is you listed the house with an entity such as byowner.com, the property hasn't been on the market?

A.   No.  We put a sign in the front lawn by owner. Not website, me, for sale by owner.  But we didn't get any bites.

Q.   And do you remember when you put that sign in the ground?

A.   Oh, I don't know.  August.

Q.   Uh-huh.  Before or after Quaker's letter?

A.   I couldn't be specific.  I don't know.

Q.   Okay.  Why did you sell your Indiana home?

A.   Lost my job.

Q.   Any other reason?

A.   Lost my job.  Couldn't afford it.

Q.   I see.  Okay.  Were you still paying a mortgage on it?

A.   Which house?

Q.   The Indiana house.

A.   Oh, no.

Q.   So you didn't have a mortgage on the Indiana house?

A.   No, you just asked me if I'm paying a mortgage on it and I says no.

going to give me my job back and let the temporary individual go because the restrictions I got from 2005 were less than the restrictions I got from 2012 as far as weight and pounds to carry.  And I thought, well, Dr. Nenadovich says I can't do 30 pounds, but the other doctor says I can't do 35, and I worked all that time doing it and now I'm coming in with a less restriction. I thought my job, I could go back to work and the person that was filling in for me that they hired on a temporary basis, they'd return him back to service for him to do something else that the service can find for him.  So I went from more restrictions to less restrictions and I don't have a job.

Q.  And you were waiting for Quaker to come back to you; is that right?

A.  Yes.  Because I don't -- Dr. Nenadovich sends it to -- I don't know if he sends it to the insurance company and the insurance company sends it to Quaker. I thought somebody would get ahold of me saying this guy is released, let me go.  There's a guy there, younger guy there doing my job.  My restrictions are less than in 2005, and now I can't have a job.

Q.  And you're talking about the restrictions that you had in 2005.  And we talked about this a little bit earlier.  Where were those reflected?  Where were the

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   They accommodated me with -- I don't remember.

Q.   So is it your contention that Quaker accommodated the disability between '06 and when you left for surgery in '13?

A.   Yes.

Q.   And what accommodations did they give you?

A.   They let me do my job the whole time, even though the doctor says I couldn't do certain things.

Q.   Were you doing those things even though the doctor, you allege, said that you couldn't do them?

A.   I was doing whatever I needed to do to work. When you're a one-man show, you do what's got to be done.  You make the customer happy.  Whatever the customer wants, you do, and if you're the only guy on site, you do it.

Q.   Even if that was outside of your restrictions?

A.   You do what makes the customer happy.

Q.   Is that a yes?

A.   Yes.  That's how it works.

Q.   Let's turn to page 3 of the complaint.

A.   Same No. 4?

Q.   Enumerated 3 at the bottom.

A.   But the same No. 4?

MR. LAYER:   Same exhibit, different page.

CK Reporting - 312.223.9201

Page: 171

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

BY MR. GARRAUX:

Q. Yes. At the top it says, "Plaintiff had an assistant that was hired prior to the plaintiff's termination, who he was training, who was much younger than the plaintiff herein," end quote.

Didn't we say earlier that you worked alone?

A. Yes.

Q. So who would you have trained or is this inaccurate?

A. Well, there was a gentleman that they hired and I was training him and his name was Feree. His last name was Feree.

Q. Can you spell that?

A. F E R E E. I may be wrong on that. That was a guy right out of high school they hired and I was training him.

Q. And when was this?

A. Prior to me leaving. I can't give you dates. I don't remember. They hired a guy to work if I was going to be gone, but the guy was pretty dense and wasn't very good and it was more of a favor they hired this guy.

Q. This Feree that you were referring to?

A. Yeah, yeah. Jack knew this guy and knew the family and did them a favor by hiring him.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q.  And he was your assistant?

A.  For a short time I was training him.

Q.  About how long?

A.  Not very.

Q.  Month, two months?

A.  Yeah, maybe a month.  And then Brad took over the training because the guy was pretty dense.

Q.  And you don't remember when this was?

A.  No, I don't remember when this was.

Q.  But it was prior to you going out for surgery?

A.  Right.

Q.  A year prior, two years prior?

A.  No.

Q.  Five years prior?

A.  No, not that long ago.  Then they tried to take him on the other side and train him there and he wasn't doing well there either.

Q.  Do you know if he's still with the company?

A.  I do not know that.

Q.  Was he still with the company at the time you left for surgery?

A.  Yes.

Q.  At Indiana Harbor West?

A.  No, East.  He went to the east side.

Q.  Sure.  How long had he left Indiana Harbor

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.  No, we just were working on him to get the tests.

Q.  So you were training him in the chemical processes aspect of your job?

A.  Right.

Q.  Anything else?  Any other part of your job?

A.  No, we were trying to get him to do the easy basic testings.

Q.  Okay.  So he wasn't handling fluid hook-ups or replenishments?

A.  Absolutely not.  He was not very good.

Q.  A bit further down under subsection E of the complaint, still same page, page 3, it says you were replaced by a younger employee who you trained.  So I think you testified earlier that you were replaced by Stefan, right?

A.  Yes.

Q.  And I think you also testified that you'd only met Stefan for ten minutes, right?

A.  Yes.

Q.  So is this inaccurate?

A.  Well, yes, it is, because I thought they were going to replace me with Feree, but I was gone and I didn't know that they hired Stefan.  I didn't know if Feree didn't work out or whatever they did with Feree.

market in Indiana, wasn't it?

A. Yes.

Q. Okay. And so how would you have worked --

MR. LAYER: Excuse me, at what time?

MR. GARRAUX: Sorry?

MR. LAYER: At what time? You said "at that time," and he said, "Yes," but --

MR. GARRAUX: Right.

MR. LAYER: I don't even know what time you're talking about, "at that time."

MR. GARRAUX: As of 2013, August of '13.

BY THE WITNESS:

A. Had I planned on working two more years?

Q. Yes.

A. I had planned on working two more years when I got my termination letter.

Q. Okay. So as of August of 2013, the letter that you claim is your termination letter, you said that from that point you were going to work two more years?

A. Yes.

Q. That was your plan?

A. That was my plan.

Q. Okay. And at that point was the Indiana residence up for sale?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   Yes.

Q.   So you were planning on selling the Indiana residence and still working two more years?

A.   I was -- Okay.  I was planning on working two more years, but when I didn't have a job, then I put my residence up for sale.

MR. LAYER:  You're not understanding his question.

THE WITNESS:  Oh.

MR. GARRAUX:  I think he's understanding it fine.

MR. LAYER:  No, he's not.  No, he's not.

MR. GARRAUX:  Read it back.

MR. LAYER:  Listen to the question, Tom.

(Record read as requested.)

MR. LAYER:  What he's asking you is when did you put the Indiana residence up for sale, before or after you got the letter?

THE WITNESS:  After.

BY MR. GARRAUX:

Q.   Didn't you tell me earlier that you put a for sale sign -- not necessarily through a Realtor or through the online utility, but didn't you say you put that up front?

A.   Yes, I did.

MR. LAYER:  But you didn't ask him when.  Did you ask him when?

Q.   Response to Interrogatory No. 5 you said that you looked for jobs for six months as part of collecting unemployment compensation; is that right?

A.   Yes.

Q.   Is that a requirement to collect unemployment in Indiana?

A.   Yes.

Q.   Do you remember where you applied?

A.   No.

Q.   Do you remember what kind of jobs you were looking for?

A.   Anything that would pay what I was making in the steel mill.

Q.   Uh-huh.  Would you consider any work that paid less than what you were making in the steel mill?

A.   I was looking for any job that I could -- that was making some decent money.

Q.   What do you consider to be decent money?

A.   53,000 a year.

Q.   Okay.  So at some point you stopped looking for work?

A.   My unemployment ran out.

Q.   Okay.  Did you stop looking for work at that point?

A.   I kept looking, but nothing would come up with

Thomas Dobosz                               Dobosz vs. Quaker Chemical Corporation

that kind of money.

Q.  Did you apply for anything?

A.  I can't remember.

Q.  Okay.  Since relocating to Florida, have you been looking for jobs in Florida?

A.  If the right job came up that paid $53,000, sure, I'd take it.

Q.  Where do you search?

A.  Paper, online.

Q.  Uh-huh.  What web sites?

A.  I don't remember.

Q.  Okay.  What paper?

A.  Tampa Tribune -- sorry -- Tampa Times.

Q.  Did you ever upload a resume to Monster or CareerBuilder?

A.  No, I have not.  It's going to be tough getting a job when you're 64 years old, making 53,000.

Q.  Okay.  So let's jump up to Interrogatory No. 11.  Take a second to jump up there, if you would. You've identified a small handful of physicians who you've treated with since 2006.  Our interrogatory requested identification of every physician you've treated with since January of 2000, so I would just ask that you and your counsel clarify the response over the next week or two.

A.   Uh-huh.

Q.   And did you ever go to a place in 2009 that you were sent to by your employer where they assessed whether or not you had any permanent restrictions?

A.   Yes, I did.

Q.   And did they conclude that you had any permanent restrictions or not?

A.   Yes, they did.

Q.   And were they the same as the 2005 accident or different?

A.   Same.

Q.   Okay.  Did Quaker ever change any part of your job after 2000 if you went back to work in 2006?

A.   No, actually, they expanded on it.  I was doing more stuff.

Q.   Any of the physical things you had to do before your 2005 accident, did you continue to do those after your 2005 accident when you went back to work?

A.   That's correct.

Q.   Okay.  Look at No. 10, if you would.  Exhibit No. 10.  That's the near miss investigation report?

A.   Getting there.  Yes.

Q.   Did you prepare that?

A.   No.

Q.   Did you sign it?

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


THOMAS DOBOSZ,)
                        )
        Plaintiff,      )
                        )
        vs.             ) No. 2:15 CV 00203
                        )
QUAKER CHEMICAL         )
CORPORATION,            )
                        )
        Defendant.      )


        I, THOMAS DOBOSZ, state that I have

read the foregoing transcript of the testimony given by

me at my deposition on the 2nd day of February, 2016,

and that said transcript constitutes a true and correct

record of the testimony given by me at the said

deposition except as I have so indicated on the errata

sheets provided herein.


                        _____
                                THOMAS DOBOSZ

No corrections (Please initial)
_____
Number of errata sheets submitted
_____ (pgs.)

SUBSCRIBED AND SWORN to
before me this _____ day
of _____, 2016.


_____
        NOTARY PUBLIC

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

UNITED STATES OF AMERICA          )
NORTHERN DISTRICT OF ILLINOIS     )
EASTERN DIVISION                  )        SS.
STATE OF INDIANA                  )
COUNTY OF PORTER                  )


         I, Jessica M. Warner Phipps, Certified

Shorthand Reporter and Notary Public, do hereby certify

that THOMAS DOBOSZ was first duly sworn by me to

testify to the whole truth and that the above

deposition was reported stenographically by me and

reduced to typewriting under my personal direction.

         I further certify that the said deposition was

taken at the time and place specified and that the

taking of said deposition commenced on the 2nd day of

February, A.D., 2016, at 11:57 a.m.

         I further certify that I am not a relative or

employee or attorney or counsel of any parties, nor a

relative or employee of such attorney or counsel, nor

financially interested directly or indirectly in this

action.

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

In witness whereof, I have hereunto set my hand at Chicago, Illinois, this 16th day of February, A.D., 2016.

_____
JESSICA M. WARNER PHIPPS, RPR
161 North Clark Street
Suite 2575
Chicago, Illinois 60601
Phone: (312) 223-9201

CSR No. 084-004485