# EXHIBIT "1"

USDC IN/ND case 2:15-cv-00203-PRC    document 30-1    filed 06/07/16    page 2 of 41

Harbor West or did Sudeep have responsibilities at other Quaker locations?

A. Yes, he did other Quaker locations.

Q. Okay. And did you continue to work alone at Indiana Harbor West until you stopped working at Quaker?

A. Yes.

Q. Okay. Introduce Dobosz 8. It's a site engineer 1 job description. Just take a moment to review the exhibit if you would.

(Dobosz Exhibit No. 8 marked as requested.)

BY MR. GARRAUX:

Q. Mr. Dobosz, I see that you're reviewing the exhibit. If you would read through the part captioned "essential duties and responsibilities," it's on the first and second pages of the job description. Take a minute, read through them and then let me know if you'd agree it provides an accurate overview of your general responsibilities as a site engineer 1.

A. Okay.

Q. Would you agree that under the essential duties and responsibilities, that's a fair summary of your general job duties?

A. I would not.

Do you see that?

A.   Where at exactly are you talking about?

Q.   Sure.   It's sort of in the middle of the page.

A.   Where?   Point to it, please.   Okay.   Yes, I see that.

Q.   And how would you do that?

A.   I would report -- I would monitor how much oil they used and how much tonnage they produced to make a report to say you're producing X amount of tons per so many gallons of oil.

Q.   Okay.   And you managed inventory, right?

A.   Monitored inventory and managed it, yes.

Q.   Okay.   And how do you do that?

A.   Check tank levels, monitor meters to see how much water, oil is being used from a day-to-day basis so I know how much they're putting in the tank so I know how much to order when -- so they don't run out.

Q.   And so you needed to access gauges on the various pieces of equipment to do that, right?

A.   Yes.

Q.   And did you ever use dip sticks to dip into tanks as a way of monitoring the amount?

A.   Yes.

Q.   And you dip that in at the top of the tank, right?

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

Q.   Okay.  So people with restrictions can continue to work, right?

MR. GARRAUX:  Objection; it's asking for a legal conclusion.

BY MR. LAYER:

Q.   Go ahead and answer.  I don't think it's legal.

MR. GARRAUX:  You can answer.

BY MR. LAYER:

Q.   Just your everyday knowledge, do you know of anyone who has restrictions -- Does everybody who has restrictions say, "Okay, I can't work anymore.  I'm done"?

A.   No.

Q.   Okay.  People with restrictions continue to work, right?

A.   Perhaps.

Q.   And people with physical restrictions continue to work?

A.   Perhaps, depending on their job.

Q.   People in the mills get hurt all the time and have comp and have permanent impairment ratings and go back to work in the mill?

A.   I don't know that.

Q.   Okay.  Anyway, so he didn't say he couldn't do

Q.   And where would you fill them up from?  So the tank or the tote is empty; how would you fill it?

A.   From a truck.

Q.   Okay.  And so you'd take a hose from the truck to the tank or the tote and fill up whatever needed filled, right?

A.   No.

Q.   Okay.  What do you mean?

A.   If the truck hooks up -- The truck driver would hook his hose to a pipe and pump it in with air pressure into the tank.

Q.   Okay.  What about the totes?

A.   He would take -- The driver would take a hose from his truck, pressurize his tank and put it in the tote.

Q.   So you weren't responsible for that?

A.   The truck drivers are.

Q.   You never filled a tote?

A.   I did.

Q.   How often did you fill totes?

A.   As they needed it when we ran out.

Q.   Okay.

A.   I don't know.  It could have been every week, could have been once a month.

Q.   Okay.

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   He did fill totes.

Q.   You said he was about your age; is that about right?

A.   He's a little younger than me.  I think he's two years younger than me.

Q.   Okay.  As part of your responsibilities would you carry containers of oil or chemicals?  And I'm thinking specifically five-gallon buckets.

A.   Not carrying, no.

Q.   What would you do with them?

A.   I would put them -- or have somebody -- If I couldn't lift them, put them on a shelf and we'd store them there.  When I couldn't lift, there was other people like Brad Wellensiek.  He says, "If you can't do it, I'll put it up there for you."  And he would do that for me.

Q.   Was Brad always there?

A.   No.

Q.   So what did you do when Brad wasn't there?

A.   Order smaller tanks.  We'd order gallon containers instead of five.

Q.   I see.  And you mentioned putting them up on a shelf.  Where was the shelf you were putting them up on?

A.   In our lab.

Q.  Okay.  You mentioned Florence Larcamp.  Did you know what her responsibilities were at Quaker or what her title was?

A.  No.

Q.  So do you recall the substance of this conversation that the E-mail reflects took place on August 27th?

A.  Well, yeah, pretty much.

Q.  And what --

A.  I don't know if it was verbatim by what's in here, but it was pretty much this.

Q.  Do you recall anything else that was part of the conversation?

A.  I don't remember.

Q.  Okay.  Now, do you remember if part of the reason for the call was that Mittal had voiced concerns that work may not have been being completed under the agreement?

A.  I never heard that from Mittal.  So I don't know if Mittal voiced concerns because they never voiced concerns to me or Shawn Rue or anybody else that came back to me.  This is the first I heard that they voiced concerns.

Q.  Was it communicated to you during this call, if you remember?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   I don't remember.

Q.   Okay.  So in the second bullet point it says, quote, "There have been some recent issues over the past few months regarding the test parameter data not being supplied to the customer as agreed upon and that predicated a meeting with the cold mill manager, Brian Hylek," end quote.

Do you recall that concern being voiced to you?

A.   Nope.  No.  No.

Q.   Did you --

A.   I don't know who that meeting was with and it wasn't related to me.

Q.   So did you respond to this E-mail to object to the -- you know, Quaker's understanding that Mittal had voiced concerns?

A.   I didn't respond to it, no.

Q.   Okay.  Any particular reason?

A.   No, I didn't -- No particular reason, but when they say that there was some issues, nobody ever conveyed that to me.

Q.   So you weren't aware of them?

A.   No.  Those meetings, whoever told Brian Hylek -- If whoever Brian Hylek told to Quaker was never conveyed to me.

Q.   Not during any call on August 27th?

A.   August 27th -- Oh, the day of this -- No.

Q.   Right.

A.   Yeah.  Craig was doing all the talking and I was doing all the listening.

Q.   So what did Craig say?

A.   Well, he just kind of laid out what he wants me to do.  He wants me to do all my job, which I was doing, because I never heard I wasn't doing my job, and I should be making my physical therapist visits after I get off work.

Q.   And that's all Mr. Hladik said during the call?

A.   That's the gist of it.

Q.   Did anybody else, whether it was Michelle or anyone else on the call, say anything else?

A.   I don't remember.

Q.   Okay.  And I know we've referred to ArcelorMittal in different ways; ArcelorMittal, ArcelorMittal USA, but we all understand that to be Quaker's client at Indiana Harbor West, right?

A.   Right.  Correct.

Q.   And do you understand that ArcelorMittal is one of Quaker's largest clients?

A.   I don't know who's big and who's small.  It's

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.    I'd have Brad or Sudeep or Shawn do it.

Q.    Every time it needed to be done?

A.    Every time I needed to see how much was in there.

Q.    And how often would these tanks be checked?

A.    Don't know.  Not every day.  Depends.  If the mill didn't run for a week, there's no sense to check the tanks.

Q.    How often was the mill down?  You keep talking about the mill being shut down.  How often --

A.    The mill was running four days a week, sometimes five.  Sometimes six, sometimes four.  Sometimes they were down all week for maintenance.  It depends on orders.

Q.    Uh-huh.  So you're saying every time a tank needed checked, somebody else did it for you?

A.    Yeah, I would say, "Hey, Brad, can you come and dip the tank for me?"  He says, "I'm here, but I'll come and do it."  Or if Sudeep was on property, I'd ask Sudeep to do it.

Q.    And when did this start?

A.    When I was -- After I got injured.

Q.    So after 2006?  We'll call it 2007, if you like.  But after 2006 to 2007?

A.    I don't remember exactly.

Q. Can you estimate?

A. No, I don't want to do that.

THE WITNESS: Can I have a bottle of water?

MR. AUSTGEN: Of course.

(A short break was had.)

(Record read as requested.)

BY MR. GARRAUX:

Q. So Mr. Dobosz, we pointed out the fourth bullet point saying it was Quaker's understanding that there were no work restrictions. I think your response was that you had told people that you had limitations in the past. Is that your testimony?

A. Yes.

Q. Okay.

A. Oh, wait a minute. It also says expects me to work 40 hours a week and complete testing as required.

Q. Right.

A. That's also part of that. See, I hadn't really -- According to Craig, my hours were these. But I really didn't have specific hours. I worked when I needed to be there.

Q. Okay.

A. Okay? Truck came in early, I worked early. Test was running long, I worked long.

Q. Right.

there, the door would freeze. Because we were right near Lake Michigan.

Q. Right. And so back to the E-mail. Craig says he's not aware of any limitations, you didn't call Craig for the reasons that you've explained. Did you call anybody else?

A. Who am I going to call?

Q. Could you have called Michelle Carter?

A. Apparently Michelle Carter knew about this because her name is on here.

Q. Right. Did you think that this was accurate?

A. No.

Q. Why didn't you call anybody?

A. I don't know.

Q. Okay. I'm going to introduce Dobosz 14. It's a functional progress note from Accelerated Rehab. Mr. Dobosz, if you take a minute and review that, please. Let me know if you've seen that in the past.

                    (Dobosz Exhibit No. 14 marked as
                        requested.)

BY THE WITNESS:

A. I don't remember seeing this.

Q. Okay. But you would agree with me that it was prepared by Accelerated Rehab?

A. Yes.

Q. Okay. I think before our break you mentioned you were always candid with Accelerated Rehab, right?

A. I did?

Q. I believe so.

A. Okay.

Q. Okay. Well, I'll ask it again.

Were you always candid with Accelerated Rehab?

A. Well, yeah, I was.

Q. You always tried, you know, to your utmost ability whenever you were asked to lift things, pull things, whatever they asked you to do?

A. Yes, yes.

Q. Looking on the first page under a sub heading called client, slash, occupation physical demand level, second line down it says, "It should be noted that this client's job as a site engineer," all caps, "as described by the client," end all caps, "is classified within the medium-heavy physical demand level based on two-hand occasional lift of 50 pounds floor to waist, two-hand occasional overhead lift of 50 pounds and pulling forces of 75" -- I believe it's "HFP," end quote.

You agree that's what it says?

A. Yes.

Q. And did you tell Accelerated what you had to

do as part of your job responsibilities as a site engineer?

A.   I told them what my job responsibilities were.

Q.   Okay.  So if you turn to the bottom of page 2, please.

MR. LAYER:  Excuse me.

MR. GARRAUX:  Sure.

MR. LAYER:  I'm not sure -- Did you ask him whether he told them that or what he told them?

MR. GARRAUX:  No, no.  And that's a fair clarification, Counsel.

MR. LAYER:  Yeah.

BY MR. GARRAUX:

Q.   Did you explain -- As part of your course of treatment with Accelerated Rehab, did you generally describe your routine regular functions at Quaker Chemical?

A.   Yes.

Q.   Okay.  So turning to the second page, starting at the very bottom, it reads, quote, "The client reports his work primarily involves moving liquids with occasional two-hand lifting of charged two- to three-inch hoses from floor to various heights, including overhead, to pump liquids into various tanks. He reports the hoses are fairly heavy and he estimates

the forces at around 50 pounds.  He also reports occasional lift and carry of five-gallon buckets of chemicals weighing up to 50 pounds, again to place in various height tanks.  He reports occasional pulling on the charged hoses in 30- to 40-foot lengths and making connections with various tanks and tanker trucks.  He reports this is a heavier task he estimates at 100 pounds maximum force," end quote.

Do you agree with me that's what it says?

A.   That's what it says.

Q.   Okay.  And is that what you told them?

A.   I don't remember, but it's -- I don't remember.

Q.   Okay.  Any reason to think that's not what you told them?

A.   I wouldn't know.

Q.   Okay.  So when you lifted the charged two- to three-inch hoses to various heights, was to fill the chemical totes at the facility?

A.   Yes.

Q.   Okay.  Any other reason that you'd lift two- to three-inch hoses?

A.   No.

Q.   Okay.  Would you estimate that those hoses weighed about 50 pounds when they were charged?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

Q.  Okay.  I'd like to direct your attention to the second paragraph of this E-mail from Florence to Liberty Mutual.  Actually, I'm sorry, it's from Liberty Mutual back to Florence.  It's Florence's E-mail at the top.  It says, quote, "The nurse case manager also spoke with the physical therapist.  He has been released from physical therapy.  He stated that the claimant has made comments that he does not wish to return to work," end quote.

Do you see that?

A.  Yes, I do.

Q.  Do you recall making any statements to any of your physical therapists that you didn't wish to return to work?

A.  I do not remember making that statement.

Q.  Did you want to return to work at that time?

A.  Yes, I did.  I had all intentions of coming back to work.  In fact, the physical therapist that worked on me at Lakeshore Bone & Joint told me, "You will go back to work."

Q.  Okay.  Well, outside of whatever they told you, was it your intention to go back to work?

A.  Absolutely.  I intended to work.

Q.  And had you purchased a home in Florida at that point?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   Yes.

Q.   Wasn't that viewed as a retirement home?

A.   A home.  I don't know if it would be retirement.  We'd be living somewhere.

Q.   Were you planning on keeping an Indiana residence and a Florida residence?

A.   Until I quit working.

Q.   And how long did you expect that to be?

A.   Oh, a couple of years.

Q.   How many?

A.   Don't know.  Depends.

Q.   Would you still be working now?

A.   If I had the opportunity I would be.

Q.   Even with the house in Florida?

A.   Yes.  I intended to go back to work after I was -- after all this surgery and I was fixed.  I had no intention of retiring.  I wanted to go back to work.

Q.   Okay.  Introduce Dobosz 16.  It's a copy of a physical demands analysis.  Take a minute, if you would, and review it and let me know if you've seen this document in the past.

                    (Dobosz Exhibit No. 16 marked as

                        requested.)

BY THE WITNESS:

A.   Okay.

I'm not sure.

Q. Okay. Next page, item 7, so page 2 of 6. It says that you had to reach from both waist to shoulder and then shoulder to overhead; is that correct?

A. Yes.

Q. Okay. And where would you do that in the facility? Where did you have to lift overhead?

A. I can't remember much lifting overhead. It was mostly like waist, to put a piece of steel on the table or to put the gallon of distilled water on the table.

Q. Uh-huh.

A. Or take my quart of solution on a table and mix it and do my testing. So it was mostly table top stuff.

Q. Okay. I think you mentioned earlier that there was some lifting of buckets up onto shelves?

A. There was one canister we put up there. Brad would put it up there and it would -- that canister would last me six to eight months.

Q. What was the canister of?

A. Hydrochloric acid, half normal.

Q. Let's turn to the third page of the assessment, item 11. It says you needed to pull 31 to 45 pounds, a maximum of three feet, twice per

A.   That's correct.

Q.   Okay.  And that's because you were still healing from the cervical fusion, right?

A.   If that's what Dr. Nenadovich says, yes.

Q.   And, of course, you need to go into the mill to collect chemical samples, right?

A.   That's correct.

Q.   And so at that time you weren't able to work?

A.   That's correct.

Q.   And did you continue to be paid by Quaker during this time?

A.   Yes.

Q.   Okay.  And you didn't request any accommodations at this point, right?

A.   As far as what?

Q.   Being able to return at some point, whether or not it was working in the trailer, et cetera?

A.   I let the doctor decide that.

Q.   Okay.  Here's Dobosz 18, April 2013 report from Lakeshore.

(Dobosz Exhibit No. 18 marked as requested.)

BY MR. GARRAUX:

Q.   Take your time to review the exhibit, Mr. Dobosz.

A. Dobosz.

Q. It's been a long two years.

A. Yes, it has.

Q. Take a look through and let me know if you've seen this before. And I'm most interested in the pages towards the back, but take your time to familiarize yourself with the document.

A. I don't know if I've seen this whole document, but it's pretty much a history of what Dr. Nenadovich did for me.

Q. Okay. Let's turn to the very last page of the report. The number on the bottom is DEF's 276?

A. 276?

Q. Very last page. You see up in activity status, sort of the very first text paragraph?

A. Okay.

Q. Do you agree that it says, quote, "No lifting, pushing, pulling greater than 10 pounds, no overhead work, no climbing ladders. He is okay to wear a hard hat"?

A. I see that.

Q. And you understood that that was your status at that point?

A. That's what Dr. Nenadovich says.

Q. Right. And you were still out of work as of

April of 2013, right?

A. I had a job, I just wasn't working.

Q. Okay. Yeah, you weren't reporting to work at Quaker at that time?

A. Correct.

Q. And you were continuing to be paid by Quaker, right?

A. Correct.

Q. And did you request any workplace accommodations at this time?

A. No, I just was waiting to get a call to come back to work.

Q. Uh-huh. At this point is it your contention that you were medically cleared to return to work?

A. The doctor has to do that.

Q. Right.

A. It's his call.

Q. Did you understand that he had made that call at this point?

A. If that's what he put down, that's what I'm -- that's what he said.

Q. Okay. Now, did you reach out to anybody at Quaker with respect to your availability for work?

A. No. I was expecting to get the okay. I was thinking maybe they were going to send me for another

physical and then get me back on the job, but I never heard from anybody at Quaker.

Q. But you never reached out either, right?

A. No.

Q. Was it your contention that you could have returned to work in April of 2013?

A. Absolutely.

Q. When is the soonest you could have returned to work?

A. Well, when the doctor released me.

Q. Okay. When do you understand that to have been?

A. I -- Whenever Quaker told me to come back to work.

Q. Okay. Let's go to Dobosz 19, a copy of the June 2013 Lakeshore report. Mr. Dobosz, again, if you take a look through.

A. Okay.

Q. Let me know if you've seen this before.

(Dobosz Exhibit No. 19 marked as requested.)

BY THE WITNESS:

A. This is 19?

Q. Yes, sir.

A. This looks like a lot of stuff from the

Q.   Okay.  And would you agree that the limitations set by Dr. Nenadovich were permanent?

A.   Says permanent restrictions right here.

Q.   Uh-huh.  Would you agree that those restrictions would preclude you from doing some of the tasks that we discussed earlier today?

A.   I don't think so.

Q.   What about the tasks that were described in the Advanced Physical Therapy note?

A.   I don't know.

Q.   Assuming that the summary of your duties in that Advanced Physical Therapy progress note are accurate, would you be able to complete them with the limitations imposed by Dr. Nenadovich?

A.   I'd rather not assume.

Q.   I'm not asking you to assume.

A.   You said assuming.

Q.   Okay.

A.   Isn't that what you said, sir?

MR. LAYER:   I think he testified that he didn't think those were accurate.  He didn't know where they came from.

BY MR. GARRAUX:

Q.   Is that your testimony, you're not certain that those are accurate?

BY THE WITNESS:

A.   That means I was getting that much money for what happened to me.

Q.   Okay.  And would you agree that this was additional impairment beyond the 4 percent impairment that you had in connection with the first workers' comp case?

A.   That's what Dr. Nenadovich said.

Q.   And do you remember what percentage of permanent partial impairment he rated you at?

A.   7.

Q.   Okay.  Did you receive any additional medical care related to this injury?

A.   When?

Q.   Since the date of the settlement, September of '13.

A.   No.

Q.   Okay.  It's your contention that after June of '13, you were released and capable of returning to your job, right?

A.   I had every intention of going back to work.

Q.   Okay.  And you were physically able to do that, right?

A.   Go back to work, yes.

Q.   Did you file a claim with Social Security

Thomas Dobosz                          Dobosz vs. Quaker Chemical Corporation

invites you to contact the company if there were any changes to your work restrictions or if there were any alternatives that you wanted the company to consider, right?

A. If there were any changes in my work conditions, right, or alternatives. Yes, that's what the letter says.

Q. So did you contact anybody at Quaker after seeing this letter?

A. It's pretty obvious here that they couldn't find a job for me. So I called, but nobody wanted to do anything but get rid of me.

Q. Who did you call?

A. I thought I called Michelle Carter.

Q. And do you remember what you said to Miss Carter?

A. No, I don't.

Q. Did you call anybody else?

A. No, because it was her name on the letter. The fact that people that I worked with didn't even know I got terminated.

Q. Uh-huh. And who were the people you worked with?

A. Shawn Rue, Brad Wellensiek.

Q. So was the injury from April of 2012 the same

Thomas Dobosz                              Dobosz vs. Quaker Chemical Corporation

to discuss filing a long-term disability claim?

A. I asked about information about it.

Q. Did you ultimately file a long-term disability claim?

A. Yes.

Q. And to file a long-term disability claim, you needed to assert that you weren't able to work, right?

A. I don't know that Prudential has to do that. I just filed. They have to do what they have to do.

Q. Do you think it's possible for someone to be on long-term disability who can work?

A. I don't know.

Q. Okay. And this E-mail says that you asked for a copy of your personnel folder; is that right?

A. That's correct.

Q. Why did you ask for it?

A. Because by law I think I have an opportunity to see it. Michelle Carter says, "I can only send you certain things and if you want your whole file, get your attorney to do it."

Q. Was there anything in particular you were looking for?

A. Just anything that was in my file.

Q. You had a question about payout of your unused vacation too, right?

Thomas Dobosz                    Dobosz vs. Quaker Chemical Corporation

A.   Okay.

Q.   Is that right?

A.   Pardon me?

Q.   Is that right, that you had a question regarding the payout of your unused vacation?

A.   Yeah, yes, that's right.

Q.   And this E-mail suggests that the conversation took place on or about August 16th, 2013, right?

A.   Yes.

Q.   And is that about when you recall the conversation taking place?

A.   Not sure.  It says it in the paper.

Q.   Was it -- To your recollection, was it the days following your receipt of the August 7th letter?

A.   Yes, it was.

Q.   Okay.  Now, I think you testified earlier that you wanted to return to work, right?

A.   Yes.

Q.   Now, if you wanted to come back to work, why were you asking the benefits manager about payout of your unused vacation?

A.   Because Quaker wasn't going to return me to work.  I wanted to, but it states right here in my termination they are unable to find any jobs within Quaker Chemical, "to identify any current openings we

says if you have further questions.

Q. It says, quote, "Should you have further questions, you may contact me at (513) 424-" --

A. That's what it says.

Q. Right?

And you didn't contact Quaker with respect to any questions other than benefit questions, right?

A. No, I called her and asked her if I had another job and she said no.

Q. If you had another job?

A. If I could work.

Q. Wait. I didn't think that's what you said before. So you're saying that you contacted --

A. I called Michelle Carter and I asked her, you know, "Do you have anything for me," and I had some questions about pensions, I had unused vacation questions and I had -- I wanted my personnel file. I called Michelle Carter on all these things.

Q. And you said, "Do you have anything for me," is what you just testified a moment ago. What did you mean by that?

A. A job.

Q. Did you mean your current job?

A. A job.

Q. Did you want to work at a different job?

Wesley Chapel, Florida?

A.   November of '13.

Q.   Okay.  So did you plan on retiring after the injuries sustained in connection with the April 20th, 2012 incident?

A.   I didn't think I was going to be terminated, so I didn't plan on retiring then.

Q.   Okay.  I'm going to introduce Dobosz 24.  It's a copy of the Pasco County tax records for your home for 2012.  Take a look at this and let me know if you've seen a copy in the past.

A.   Yes.

Q.   Okay.

A.   It's 24?

Q.   It is 24.  Yep.

                    (Dobosz Exhibit No. 24 marked as
                      requested.)

BY MR. GARRAUX:

Q.   And you'd agree with me this is the tax bill for your home in Wesley Chapel, right?

A.   Yes.

Q.   And you see towards the bottom where it says HMSTD exempt?

A.   Correct.  I see that.

Q.   Do you understand that to mean that you

going to give me my job back and let the temporary individual go because the restrictions I got from 2005 were less than the restrictions I got from 2012 as far as weight and pounds to carry. And I thought, well, Dr. Nenadovich says I can't do 30 pounds, but the other doctor says I can't do 35, and I worked all that time doing it and now I'm coming in with a less restriction. I thought my job, I could go back to work and the person that was filling in for me that they hired on a temporary basis, they'd return him back to service for him to do something else that the service can find for him. So I went from more restrictions to less restrictions and I don't have a job.

Q. And you were waiting for Quaker to come back to you; is that right?

A. Yes. Because I don't -- Dr. Nenadovich sends it to -- I don't know if he sends it to the insurance company and the insurance company sends it to Quaker. I thought somebody would get ahold of me saying this guy is released, let me go. There's a guy there, younger guy there doing my job. My restrictions are less than in 2005, and now I can't have a job.

Q. And you're talking about the restrictions that you had in 2005. And we talked about this a little bit earlier. Where were those reflected? Where were the

A.   Sorry.  I met him.  I thought his name was Steven.

Q.   No worries.

A.   And I think he's still working with Quaker.

Q.   Do you know when he was hired?

A.   No.

Q.   Okay.  Do you know when he was brought on as a temp?

A.   No.

Q.   Okay.  A little further down you say, "I was fired because of restrictions after a work injury.  I had more restrictions in prior years, which were ignored," end quote.

Now, is it your contention or are you arguing in this case that you were physically capable of performing the physical functions of your position?

A.   Yes.

Q.   Okay.  And are you claiming that the restrictions placed by Dr. Nenadovich would not have limited you in performing that work?

A.   That's correct.

Q.   Okay.  So you mention that you had prior restrictions, which I think you described as being ignored, both here and earlier today.  Right?

A.   Yes.

A.   Okay.  I don't see the word routinely in there.

Q.   Okay.  Do you agree with me that it says, "Since" -- quote, "Since the letter does not say there was a permanent restriction of this required repetitive motion of climbing a vertical ladder, and you've been doing it since returning to work from the previous claim, we will need documentation stating that the current restriction of climbing vertical ladders and if that restriction is, in fact, permanent."

You agree that's what it says?

A.   That's what it says, right.

Q.   Right.  Okay.  And do you disagree with that assessment?

A.   Yes.

Q.   Okay.  So you didn't routinely climb ladders after 2006?

A.   Not routinely.

Q.   About how often?

A.   As necessary.

Q.   How frequent would that be?

A.   I couldn't tell you.

Q.   Once a day, once a week?

A.   It wasn't once a day.  Might not be --

Q.   Twice a week?

A.   -- once a month.  Just depends, as we spoke earlier, work conditions.

Q.   Uh-huh.  Referencing back to Dobosz 27, is it your belief that hiring an employee at a lower salary is indicative of age discrimination?

A.   I believe that.

Q.   Mr. Dobosz, do you recall telling the EEOC investigator that, at most, you would need to lift a single quart of oil to fulfill your duties as site engineer?

A.   Solution not oil.

Q.   Okay.  Solution?

A.   Solution.  That's what -- I take a quart to do my test.

Q.   So the heaviest thing you'd have to lift --

A.   To do my tests would be a quart, a liter, whatever that size.

Q.   What about the steel plate samples?

A.   That's to do the solution tests.  The steel plate samples I said they would not weigh over 15 pounds.

Q.   I see.  So when you say --

A.   And I think Mr. -- the -- Mr. Norvanis seen a sample of what I did.

Q.   Just for clarity of the record it's Norvanis,

whole lot more money on a construction firm coming in there and cleaning it out and refilling and costing more product.  There was a lot of stuff done to keep the customer happy.  It was all the culture to keep the business because you wanted to keep the business.  You know what I mean?

Q.   So what did you do to help keep the business?

A.   Whatever my people above me told me to do.

Q.   Uh-huh.

A.   So, you know, there was a lot of behind the scenes stuff going on that maybe corporate didn't know about, but this is how things got done to keep the business.

Q.   Uh-huh.  And things that were outside of your job description, you're saying?

A.   Oh, sure.  Oh, sure.

Q.   Uh-huh.  Any other examples?

A.   Those are big ones right now.

Q.   Uh-huh.

A.   We had the biocides locked up in the trailer in the bathroom that was non-functional.  EPA was on property.  "Tom, lock the trailer up and go home.  We don't want them coming in there because they can come in there and check and ask you questions."  "Okay, Shawn, I'm going home."

back to work, if Quaker accommodated you.  Do you know what the word accommodated means in the sense that counsel asked the question?

A.  Not really.

Q.  Okay.  Did they make any changes to your job because of restrictions that you had?

A.  No.

Q.  Okay.  Exhibit No. 4 is the -- 3, I'm sorry.  3 is the APAC PPI rating, correct?

A.  Okay.

Q.  And you were asked is that the only document or is that the document that you contend that Quaker had or was provided to show your restrictions or show whether or not you had permanent restrictions.  And my question to you is, after you got released by the doctors from your 2005 accident, what was your understanding as to whether or not you had any permanent restrictions?

A.  That I couldn't climb ladders and lift over whatever the doctor recommended I shouldn't lift.  That was my interpretation.

Q.  Okay.  And did you ever see a document that listed that?

A.  Yeah, I did have one somewhere.

Q.  Okay.

A.  Uh-huh.

Q.  And did you ever go to a place in 2009 that you were sent to by your employer where they assessed whether or not you had any permanent restrictions?

A.  Yes, I did.

Q.  And did they conclude that you had any permanent restrictions or not?

A.  Yes, they did.

Q.  And were they the same as the 2005 accident or different?

A.  Same.

Q.  Okay.  Did Quaker ever change any part of your job after 2000 if you went back to work in 2006?

A.  No, actually, they expanded on it.  I was doing more stuff.

Q.  Any of the physical things you had to do before your 2005 accident, did you continue to do those after your 2005 accident when you went back to work?

A.  That's correct.

Q.  Okay.  Look at No. 10, if you would.  Exhibit No. 10.  That's the near miss investigation report?

A.  Getting there.  Yes.

Q.  Did you prepare that?

A.  No.

Q.  Did you sign it?

A.  I don't remember signing this at all, no.

THE WITNESS:  When he's done I still want to say one more thing.  I can do that?

BY MR. LAYER:

Q.  You said you had conversations or at least a conversation, maybe more than one conversation, with Michelle Carter; is that correct?

A.  Yes.

Q.  Okay.  Was it after your 2012 accident?

A.  Yes.

Q.  Okay.  Did you ever discuss with her whether or not you had the ability to come back after your 2012 injury and do your job?

A.  Yeah, I did.  I told her I can still do my job.

Q.  Okay.  Do you remember what, if any, response she had when you said that?

A.  I don't remember her response.

Q.  Okay.  And you said that your restrictions were less after the 2012 injury than they were after the 2005.  What do you mean by that?

A.  Dr. Nenadovich said I could do 30 pounds, the other doctor says nothing over 35 pounds.  So actually, it was five pounds less than the first restriction.

Q.  Now look at No. 16, Exhibit No. 16.

A.   Okay.

Q.   Do you have any idea who prepared that?

A.   I do not.

Q.   Did you have any input -- Did anyone ever talk to you about what is contained in here as far as what your job description was?

A.   I don't remember.

Q.   It was suggested that you electronically sign this document.  Have you ever seen this document before it was produced either here today or --

A.   No, I said I -- I believe I said that earlier. I have never seen this document before.

Q.   And did you ever discuss this document with anyone, to the best of your knowledge?

A.   I did not.

Q.   And did you electronically sign this document?

A.   I don't remember doing that.

Q.   Well, I mean, did you ever remember seeing it?

A.   No, not until today.

Q.   Okay.  Well, would you have signed something you never saw before?

A.   Absolutely not.

Q.   In terms of your going back to work after your 2012 injury, Tom, one of the restrictions that was discussed here for a while, and then there's some

document here where it got eliminated, was that you couldn't wear a hard hat; is that right?

A. Right.

Q. And was there a problem with you doing your job if you couldn't wear a hard hat, and if so, what was it? Were there places you couldn't go?

A. I couldn't go. I couldn't in the mill because that was a requirement. You had to have a hard hat and safety shoes.

Q. Okay. And when you were in the last part of your therapy after your surgery --

A. Okay.

Q. -- that was with who?

A. Dr. Nenadovich. And then I did my physical therapy with Sandy Woodworth from Lakeshore Bone & Joint, the physical therapy part of that company.

Q. And did you have any therapy that involved the hard hat?

A. Yes.

Q. What sort of the therapy did you have?

A. She had me put the hard hat on and go through all the exercises and therapy things she does with me every day and see how I responded.

Q. And what's your understanding of the purpose of that?

A.  To see if I could do what she had me do with a hard hat on.

Q.  Was it fun?

A.  No.

Q.  Would you have ever done that if you intended on retiring and not going back to work?

A.  No.

Q.  Look at No. 18.

A.  18?

Q.  Yeah, 18 and I think 21.

A.  Do 18 first?

Q.  Yeah.

A.  Okay.

Q.  Yeah.  18 and 19.  Look at both of those. Look at the second page.

A.  On 18?

Q.  Yes.  Look at the second page.

A.  Okay.

Q.  That appears to be addressed to you, does it not?

A.  Correct.

Q.  And look at the other one, 19, is it the same? I mean, does it appear to be addressed to you, both of them?

A.  Yes.

work?

A. Not at all. I thought I'd be back to work.

Q. Okay. You were asked about applying for long-term disability. What was your understanding as to why you couldn't go back to your job as far as what Michelle Carter told you in the letter you received?

A. She says because of my restrictions I can't go back to my job.

Q. Okay.

A. Imposed by Dr. Nenadovich.

Q. Okay. And did you -- Did that enter in your mind when you applied for long-term disability?

A. Sure.

Q. I mean, when you got that letter, August 7th, did they pay you anymore after that other than the benefits you had coming?

A. Right. Some vacation and stuff. I didn't get anything else after my last paycheck. I think they paid me until September 5th. That was any termination date.

Q. So at that point, what sources of income did you have?

A. None.

MR. LAYER: That's all I have.

MR. GARRAUX: I just have one follow-up.