# EXHIBIT "2"

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

Q. Okay. And when did you -- What did she tell you?

A. I immediately got ahold of Florence after speaking with Tom to ask her what information she might have about the previous injury and she provided me the letter from APAC.

Q. And that's all she provided you?

A. That's correct.

(Carter Exhibit No. 1 marked as requested.)

BY MR. LAYER:

Q. What -- Is that what you're talking about?

A. Yes.

Q. And what -- What did you determine from that when you -- what were your conclusions when you saw it in 2012?

A. Upon reviewing it, it wasn't clear to me if he had permanent restrictions, so I sent Mr. Dobosz an E-mail and provided him a copy of this document, asking him for additional information on a work restriction that he may have.

Q. And what -- What, if anything, did you learn from that?

A. He didn't reply to me. I got no response.

Q. Did you do anything else to find out what his

work restriction was?

A. No.

Q. Okay. Did you discuss it with Florence?

A. I don't remember.

Q. Did you ever have a discussion with Florence as to her understanding of how Indiana workman's compensation worked as opposed to other states that Quaker may be involved in?

A. No.

Q. Okay. And did you understand at that time or do you understand now that in Indiana workmen's compensation, the employer, through its insurance company, through the adjustor, controls all medical treatment for the injured worker? Were you aware of that?

MR. GARRAUX: I'm going to object to the form and I'm going to object in that it requests a legal conclusion. Miss Carter is not a lawyer.

MR. LAYER: Okay. She's not aware, is that what you just said?

MR. GARRAUX: I said she's not a lawyer.

MR. LAYER: Oh, I thought you said she's not aware.

BY MR. LAYER:

Q. Okay. You can answer the question.

A. I'm not responsible for processing workers' compensation.

Q. I understand. But you ultimately made the decision, along with one other person, to terminate Mr. Dobosz, did you not?

MR. GARRAUX: Object to the form. It's asking -- it's assuming facts not in evidence.

BY THE WITNESS:

A. And that's not correct.

Q. Okay. Who made the determination to terminate Mr. Dobosz?

A. Quaker Chemical did.

Q. Okay. Who at Quaker Chemical participated in making that decision besides yourself or did you not?

A. A group of individuals evaluated all of the facts from Mr. Dobosz's claim and medical treatment after we received his PPI report in June of 2013; and that would've included myself, my manager in human resources, internal and external counsel.

Q. So who -- And you based it on the information you got from the final report from his -- from where? From who?

A. I don't know the name of the place. I'd have to see the document.

Q. Okay. And was there any -- any conversation

BY MR. LAYER:

Q.   Would you look at No. 2, if you would --

A.   Sure.

Q.   -- and see if you recognize that?

A.   I hadn't seen this prior to litigation for this case.

Q.   Okay.  Since litigation, have you inquired as to what it is and why it exists?

A.   No.

Q.   Okay.  Are you aware that Quaker sent him to this place for a determination of his restrictions?

A.   I am not.

Q.   Okay.  I mean, are you aware that this was provided in discovery from Quaker?

A.   I'm not, prior to preparing for this litigation.

Q.   Okay.  But you've now found out that this was something we got from Quaker?

A.   Correct.

Q.   Okay.  And do you know now that -- Have you inquired and do you know that Quaker actually sent him to this health resource place for these -- for this determination?

A.   I am now, yes.

Q.   Okay.  And so it is correct, is it not, that

assuming for the moment Quaker wasn't aware of his permanent restrictions 2005 through 2008, in January of 2009, they were aware of his permanent restrictions, were they not?

A.  I don't see anything in here that says those restrictions are permanent.

Q.  Did anyone inquire, to your knowledge?

A.  Not to my knowledge.

Q.  What was the purpose for sending him there, was it to find out what his limitations were for the next two days or next couple weeks?

A.  I don't know.

Q.  Okay.  Do you -- Have you inquired as to whether or not when someone puts in a report after an examination like this saying what the restrictions are, that it doesn't mean on a temporary basis, it means permanently unless it says otherwise?

A.  No, I'm not aware of that.

Q.  And did you or anyone in your team that made the decision to terminate Mr. Dobosz ever inquire about that?

A.  No.

Q.  So no one called this place and asked them, before you decided to terminate him, were these permanent restrictions in 2009?

Q. Okay. And let's assume for the moment you were aware he had no lifting of 35 pounds and no climbing ladders. Would he have been able to do his job?

A. Not from my understanding of the position.

Q. Okay. But you heard him testify that those were his restrictions, did you not, yesterday?

A. I heard him testify he believes those were his restrictions.

Q. Okay. And he also said he thought there was more documents than that No. 1 to document his restrictions.

MR. GARRAUX: Going to object to the form.

BY MR. LAYER:

Q. Did you not hear him say that?

MR. GARRAUX: I don't remember him saying that, Counsel, so let's not try to testify for Mr. Dobosz through Miss Carter.

BY MR. LAYER:

Q. Do you remember him saying that?

A. I don't recall everything he said yesterday, no.

Q. Okay. And was Florence around in 2006?

A. I don't know.

Q. I don't think we need to mark this as an

not sure anybody does, but it's the insurance company. So again, there's a request for Tom to do something he's not able to do and Florence should have known that. Did that ever come up? Did Florence say, "Hey, I can get that"?

MR. GARRAUX: I'm going to object. There's no question here. What's the question?

BY MR. LAYER:

Q. There is a question.

Did Florence ever say, "Hey, I can get that information. That's my job"?

A. No.

Q. "I'll get it from Liberty Mutual, I'll get it from the nurse case manager"?

A. No.

Q. I mean, you have talked -- You did talk to Florence in 2012 and 2013 about her conversing with the nurse case manager and getting information from the nurse case manager on Tom's case, did you not?

A. No.

Q. Never?

A. Not that I can recall.

Q. Okay. Did you ever inquire what the nurse case manager's function was with Florence?

A. No.

A.   No.

Q.   Okay.  And again, look at the one, two, three, fourth from the bottom.  Again, apparently you and Craig and Florence or Quaker are directing Tom Dobosz to schedule his therapy visits at certain times.  Is that what that basically says?

A.   No, it says we asked him to do that, not that we directed him.

Q.   Okay.  And Florence was in this conversation; do you remember whether or not she said it's not up to him, that the nurse case manager sets all the appointments?

A.   No.

Q.   Okay.  Have you come to find out that that's the way it works in Indiana or not?

A.   No.

Q.   Okay.

(Carter Exhibit No. 4 marked as requested.)

BY MR. LAYER:

Q.   Do you recall sending this E-mail to Tom?

A.   Yes.

Q.   And obviously it indicates that you talked to Florence about it, correct?

A.   Yes.

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

Q.   He was going to work every day?

A.   Yes, he was reporting to work.

Q.   Reporting to work and doing his job?  Or are you saying he wasn't doing his job?

A.   I don't know what we're defining as doing his job.

Q.   Getting the stuff done that needed to be done for the mill.

A.   I would say no because that is what prompted the conversation at the end of August that there were things that were not getting done.

Q.   Okay.  And you are aware of that personally?

A.   It was reported to me.

Q.   Are you aware of that personally?

A.   No.

Q.   Did anyone from Mittal Steel complain to you?

A.   No.

Q.   Do you know who at Mittal Steel -- who complained to Craig supposedly?

A.   No.

Q.   Do you know who at Mittal Steel complained to him?

A.   Brian Hylek.

Q.   Okay.  Is that what he told you?

A.   That's what Craig told me.

say a few minutes ago was he said he had physical restrictions, right?

A.   Correct.

Q.   Okay.  Do you think that he had physical restrictions as you sit here now in 2008, 2009?

A.   I haven't seen anything that said anything about restrictions.  I just saw this report.

Q.   But you've now seen this?

A.   As part of preparing for this litigation, yes, but not in 2012.

MR. GARRAUX:  Just for clarity of the record, when we refer to "this" --

MR. LAYER:  I'm sorry, No. 2.  You're right. Exhibit No. 2.

BY MR. LAYER:

Q.   But this indicated in 2009 he had restrictions, right, this No. 2, Exhibit No. 2?

MR. GARRAUX:  Take a look at the document.

BY MR. LAYER:

Q.   The document indicates he has restrictions, January 27th, 2009?

A.   It does say he has restrictions.

Q.   And he was working doing his job in January 2009, was he not, to the best of your knowledge?

A.   Yes, he was working.

the job, he said, "I have physical restrictions," right?

A. That's what he said.

Q. Okay. Did you, when you had this conversation with him and Craig and Florence, ask Tom, "Tom are you able to do your job?"

A. No.

Q. Okay.

(Carter Exhibit No. 5 marked as requested.)

BY MR. LAYER:

Q. Do you recognize that?

A. Yes.

Q. What is that?

A. It is a report from Accelerated Rehabilitation Center.

Q. And who requested that report and why?

A. I don't know who requested it.

Q. Did you -- When was the first time you saw this?

A. Florence shared a copy of it with me on the 31st of August.

Q. Okay. And what, if any, conclusions did you draw after you received this?

A. That Mr. Dobosz did have some limitations and

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

talking about somebody saying, "Hey, Tom can't do this. Tom can't carry this. Tom can't climb this, can't do that." You got nothing from that?

A. From no one other than Tom.

Q. And again, are you saying that Tom told you, "I can't do this, I can't do that, I can't lift this, I can't" -- did he say those words to you, "I can't do the job"?

A. "I'm not supposed to be climbing ladders."

Q. Okay. But that was -- that was -- He told you that was true since 2006, did he not?

A. That is what he told me.

Q. Yeah. And he'd been climbing ladders for six years, right?

A. I don't know. He said yesterday he had and then he said he hadn't.

Q. He said he had and he hadn't? Okay. You're quoting his testimony yesterday?

A. I'm telling you what I recall.

Q. Okay. Well, best you recall you said, what, he changed his mind or what?

A. Yes.

Q. That he said he hadn't -- the specific question was: "Had you climbed any ladders from 2006 to 2012?" And he changed his mind and said no, is that

THE WITNESS:  Read that again.

(Record read as requested.)

BY THE WITNESS:

A.  No, he didn't say he hadn't climbed any ladders.

Q.  Okay.  Then maybe it's me, I'm confused.  So what are you saying he said then?

A.  He told me in the conversation in August of 2012 when I was an employee of Quaker that he was not supposed to be climbing ladders.

Q.  Which is confirmed, at least in Exhibit No. 2, as of January 2009, correct, as a permanent -- as a limitation, right?

MR. GARRAUX:  Object to form.

BY MR. LAYER:

Q.  Restriction?

A.  That document does say that, yes.

Q.  Yeah, okay.  So at least somebody said at some point he wasn't supposed to be climbing ladders, right?

A.  Yes, according to that document.

Q.  And that is something that we at least believe was an opinion secured by Quaker in 2009, correct?

A.  Yes.

Q.  Okay.

(Carter Exhibit No. 6 marked as

requested.)

BY MR. LAYER:

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   It's a physical demands analysis.

Q.   Performed or done -- compiled by whom, if you know?

A.   This analysis specifically?

Q.   Yes.

A.   Prepared by Craig and Tom, to my knowledge.

Q.   Well, does it say "associate name" and "date prepared" down at the bottom?

A.   The very last page or --

Q.   All of them?

A.   Oh, no, not in the footnote.

Q.   Okay.  I mean, that's on every page, right, and does it say who prepared it down there in the date?

A.   Not in the footnote, no.

Q.   Okay.  And why was this prepared?

A.   As part of our workers' comp analysis and short-term disability analyses we have a physical demands analysis completed on our jobs.

Q.   And you say you know for a fact that Tom

A.   No, but Mr. Hladik is the one that sent the attachment to me from his Quaker E-mail.

Q.   Well, I mean, correct me if I'm wrong, doesn't the typing of the names in there appear to be identical typing of the preparation of this?  I mean, the letters are exactly the same size and everything, whoever typed this document.

MR. GARRAUX:  I'll object to the form.

BY MR. LAYER:

Q.   Doesn't it appear that that's exactly how it is?

A.   Yes.

Q.   Okay.  I mean, usually computerized signatures like that appear much different than this, don't they?

A.   I don't know, I've only used PDF.

Q.   Okay.  Well, did you hear Tom say yesterday that he never saw this before?

A.   I did.

Q.   Okay.  In any case, this was prepared in what, September of 2012, right?

A.   Correct.

Q.   And subsequent to that, Tom had something done regarding his injury, did he not?

A.   You mean in the future?

Q.   I'm talking about in October.

Q. As of June 24th, 2013, when Dr. Nenadovich released him?

A. Yes.

Q. And those restrictions are five pounds different than what's in Exhibit No. 2, the health resource document, but the climbing ladders is no longer there in this particular document, correct?

MR. GARRAUX: Give her a second to pull out Exhibit 2.

BY THE WITNESS:

A. Let me pull out the Health Resources document.

Q. Sure. Go ahead.

A. That's correct.

Q. With these restrictions, isn't it fair to assume that if Tom was doing his job from 2006 through 2012 when he got hurt again, and now his restrictions were only five pounds more, but less in terms of other restrictions, as far as you were concerned, wouldn't you assume he could do the job?

MR. GARRAUX: Objection to form.

You can answer the question.

BY THE WITNESS:

A. Can you read back the full question.

(Record read as requested.)

BY THE WITNESS:

A. No, I would not make that assumption.

Q. Well, I don't mean assume it and take action on it, but at least think that the restrictions are less than what he said they were before. So, you know, he's been doing the job, so, yeah, he should be able to do it. You wouldn't think that?

A. Quaker viewed the 2012 injury as a completely separate event from the 2005 injury. So the 2012 event that we're speaking about was evaluated on its own.

Q. Okay. But so you're saying that no lifting or pushing, pulling more than 30 pounds frequently or more than 30 pounds occasionally, that would not allow him to do that job anymore; is that what you're saying, in your opinion?

A. Not the full capacity of the job, no.

Q. Okay. And I guess the question is, says who?

A. The physical demands analysis and my knowledge of what the job required.

Q. Your knowledge of what the job required. And how did you acquire the knowledge of what the job required? How did you acquire that knowledge?

A. As I became more familiar with Quaker through my employment, learning about what Quaker does and the jobs.

Michelle Carter                Dobosz vs. Quaker Chemical Corporation

Q.  Let's look at the second page of that -- this little group exhibit here.

MR. GARRAUX:  10.

BY THE WITNESS:

A.  Of 10?

Q.  Yeah.  It's an E-mail from you -- sorry, from Florence to you, correct?

A.  Yes.

Q.  And there's some handwriting on it, correct?

A.  Yes.

Q.  Is that your writing?

A.  No.

Q.  Whose handwriting is that?

A.  I don't know.

Q.  As I read it, it says, "settlement figure by Tuesday.  Now we know let him go would not impact settlement.  6/28 pay through.  Copy letter to me for Liberty by Tuesday"?

A.  Okay.

Q.  Well, is this something -- I mean, I would assume either you or Florence wrote that, right?  To me --

A.  I did not write this.  This is not my handwriting.

Q.  Well, do you have any idea "now we know let

A.  That's what this says.  It does not say he had a physical disability.

Q.  Physical limitation, permanent impairment, right, and you determined that --

MR. GARRAUX:  Objection; that's not what the document says.

MR. LAYER:  The document says he --

MR. GARRAUX:  Doesn't say permanent impairment.

MR. LAYER:  Number 1 doesn't say permanent impairment?

MR. GARRAUX:  Oh, you're referring back to the 2006 document?  I thought you were talking about the 2013 document.

BY MR. LAYER:

Q.  Wait.  Are you suggesting that Tom didn't have any permanent impairment from his 2012 injury?

A.  According to this, yes, he has permanent restrictions.

Q.  Okay.  Permanent restriction and permanent impairment are two different things, okay?

A.  So no, I would not say permanent impairment.  This says permanent restriction.

Q.  You're not aware that Liberty Mutual, the insurance company for Quaker, paid him a lump sum of money in this settlement document that was put into

that you, as a human resource person acting on behalf of the Quaker at the time, had an obligation to accommodate him if you could?

A.   I think the letter shows that yes, we did.

Q.   Okay.   I'm not asking whether you did try and accommodate him.   Did you feel as human resource employee, head of human resources for Quaker, did you feel you had an obligation to do what you claim you did?

MR. GARRAUX:   Objection to form.   She's not the head of human resources for Quaker.

BY MR. LAYER:

Q.   As part of the team then.   As part of the team that made the decision to terminate him, you were acting on behalf of Quaker, right?

Let's go back.   Were you acting on behalf of Quaker as that team?

A.   Yes.

Q.   And I understand you're saying you did try and accommodate him by virtue of that letter.   What I'm asking you is did you, as part of that team, feel you had an obligation to do that?

A.   I guess the answer would be yes.

Q.   Okay.   Did you ever show Tom, based on the knowledge you had in 2013, as to the fact that he may

have had some restrictions from 2006 to 2012 and still worked and he has -- restrictions were stated as no overhead and no more than 30 pounds frequently, did you ever consider as part of your obligation to accommodate him to say, "Tom, here, you've been working for us for ten years, been doing a good job based on your performance reports, and we had a little problem after you got hurt here."

MR. GARRAUX: Objection; it's assuming something that's not in evidence. The performance reports are not in evidence and I don't think they've ever been discussed.

MR. LAYER: Well, withdraw that part of the question.

BY MR. LAYER:

Q. "Tom, as a loyal employee of ten years, and since we acknowledge we have an obligation to try and accommodate you if we can, here's what we'll do. If you think you can do the job, your old job, you come back, do it, 30-day trial period, see if you can do it."

Did you ever do that?

A. Did we ask him that?

Q. Did you ever offer him that?

A. No.

BY THE WITNESS:

A. Yes, that's what I'm saying.

Q. Okay. But the doctor doesn't say those words in that document, does he?

A. No.

Q. Okay. So the doctor didn't make the decision that he couldn't work, Dr. Nenadovich, did he?

A. Doctor did not make his termination decision.

Q. He didn't tell you -- He didn't tell you or anyone from Quaker that given this set of requirements, Tom can't do it?

A. He didn't tell me that, no.

Q. Okay. And you, as part of the team, decided to fire Tom Dobosz and decided he couldn't meet his job requirements with his restrictions without ever talking to his treating physician, correct?

A. That would not be part of my job to speak to his treating physician.

Q. Do you think that maybe someone might say part of your job was to do whatever it is you needed to do to try and best, under the law, to accommodate this employee who got hurt on the job and had impairment and was disabled?

MR. GARRAUX: Objection to the form and also assumes legal conclusions.

him.  I'm his doctor.  I know what he can do.  Given these requirements, he either can or cannot do that."

Are you saying that it was the obligation of the employee to do that or did you think that Quaker had an obligation to do that?

MR. GARRAUX:  So long as you're just giving your own personal thought and not your understanding of the law, you can go ahead and answer.

BY THE WITNESS:

A.  I guess my answer would be I don't know what information was provided to the doctor necessarily for the assessments that he made.

Q.  And nobody from Quaker attempted to inquire did they?

A.  I did not attempt to inquire.  I'm not aware of what anybody else did.

Q.  Okay.  Well, again, the team was Haines, you and who?

A.  Internal and external legal counsel.

Q.  Okay.  Did any of them, to your knowledge, inquire with the doctor?

A.  Not to my knowledge, no.

Q.  Okay.  And again, I'm asking for your knowledge in terms of you were acting on behalf, you and the team were acting on behalf of Quaker and you

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

said that Mr. Dobosz never asked for an accommodation. And my question to you, again, because I don't think -- we got distracted and off of course and never got an answer -- is it your contention as a team member that that was -- that onus, that responsibility was on the worker?

A.   Yes.

Q.   And is it your contention as a team member who terminated him that Quaker had no obligation to accommodate him?

A.   No, that's not my contention.

Q.   You did have -- You did have an obligation to try and accommodate him, right, or no?

A.   I think we discussed this already.  We did ask Mr. Dobosz in his termination letter that if he had suggestions that we had not considered, that we would be willing to consider those possible accommodations.

Q.   And you heard him say yesterday, he said, "I can do the job," correct?

A.   That's what he said.

Q.   And you deny that he ever said that?

A.   No.

Q.   Pardon me?

A.   I don't deny he said it.

Q.   You don't deny?

Do you remember telling him that?

A.  Yes.

Q.  Okay.  And you did not discuss his termination with any of his supervisors; is that correct?  That's what you told Norvanis and that's correct?

A.  That's correct.

Q.  Wouldn't his supervisors have known whether he was able to do the job before the 2012 injury?

A.  We would have to look at his employment record.  But his supervisor at the time of his termination did not ever supervise him while he was working.  So he had gone out on his surgery -- And again, we'd have to look at the employment record to see who his supervisor was.  So no, they were not engaged.

Q.  Wouldn't they know better than anybody?

A.  Perhaps not his current supervisor at that time.

Q.  Or a prior supervisor that was a supervisor after he got hurt until his surgery?

A.  Mr. Hladik provided the physical demands analysis of the job.

Q.  Yeah, but he wasn't there every day to see whether Tom could do it or not, was he?

A.  I don't know how often he visited.

Q.  There were people out there either in Quaker or the mill who did know whether Tom could actually physically do the job on a daily basis, weren't there?

A.  Yes.

Q.  And nobody ever talked to them, did they?

A.  No.

Q.  It says here, and I think you've already said that you told Mr. Norvanis that you relied solely on the April medical report and the physical demand analysis?

A.  Where is that in here, I'm sorry?

Q.  Same paragraph, a little bit further down.

A.  It -- That is what I said at the time, that the decision wasn't made until after the June report.

Q.  And you also said that risk management provided the physician with information used in conducting the physical demand analysis.

Okay.  So are you saying that Quaker provided Dr. Nenadovich with the information used in conducting in the physical demand analysis?

A.  That is my understanding, that that is why we collected that information in September of 2012.  So it could be used as part of this medical file.

Q.  Well, but it says "provided the physician," that would be Dr. Nenadovich because he was the

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

treating physician, was he not?

A.  Yes.

Q.  He was the surgeon?

A.  Uh-huh.

Q.  And there was some purpose, I assume, in providing the doctor with the physical demands analysis?

A.  I can't speak to why we would provide it.  I'm not part of risk management.

Q.  Well, it might be to have his opinion as the man, the doctor who treated him and who decided what his restrictions are and what his impairment was to look at the job analysis requirements and see whether he could do it or not.  Wouldn't he be the best person besides Dobosz himself to say whether he could do it?

MR. GARRAUX:  What's the question, just the very tail end?

BY MR. LAYER:

Q.  Wouldn't he be the best person -- the preliminary part is you told Norvanis, and we'll assume it's true, that that assessment was sent to the physician, I assume with a purpose?

A.  Okay.

Q.  And my question is:  Wouldn't the physician be in the best position to determine, like I talked about

before, take the restrictions and take the job physical analysis requirement and let the person who knows better than Dobosz himself -- he's the only person that knows better -- whether he can do it?  Wouldn't he be the best person to do that?

A.  I don't want to assume that.

Q.  Well, who would?

A.  I don't want to assume that.

Q.  Some person up in corporate whose never even been to the facility or never walked around and had anybody explain what Dobosz does, because isn't that what happened, ma'am?

MR. GARRAUX:  Objection to form.

You can answer.

BY MR. LAYER:

Q.  Isn't that what happened?

A.  No one had visited the site.

Q.  No one had visited the site and no one had anybody from the mill or from Quaker walk them around and say "this is what Tom has to do," or have Dobosz walk around and say "this is what I have to do."

MR. GARRAUX:  Who is "them"?  You said walk "them" around; walk who around?

BY MR. LAYER:

Q.  Anyone from Quaker who knows what his job was

Michelle Carter                    Dobosz vs. Quaker Chemical Corporation

employment at 65 years of age after being injured twice at that job, would've been a good thing to do on the part of his employer to make an informed decision as to whether or not he could really do the job or not?

A. The team decided we had the information necessary to make that decision.

Q. Without any input from the treating physician except the impairment rating and the permanent restrictions, correct?

A. That's correct.

Q. Now, are you aware that -- What was the last name, if you know, of the young man who was called in to sub for Tom when he was hurt?

A. The temporary?

Q. Yeah.

A. Scott was his last name.

Q. Scott. Is it Steven or Stefan?

A. Stefan.

Q. Okay. Are you aware that Stefan told Mr. Norvanis that nobody from Quaker ever asked him whether he needed help to do the job or whether he could do the job or what he had to do in the job? Are you aware of that, that he told --

A. No, I'm not.

Q. That he said, "Nobody ever asked me"?

Michelle Carter                  Dobosz vs. Quaker Chemical Corporation

A. I'm not aware of Stefan's testimony, no.

Q. Okay. But are you aware that he testified to the federal government that the poundage and the requirements to lift and the heaviness that was described in the exhibit that was sent by Quaker to the EEOC, Scott said that was overstated?

A. I didn't participate in his testimony.

Q. Have you talked to -- is Mr. -- Is Craig still employed?

A. With Quaker, yes.

Q. Have you talked to him to see whether he says that Tom gave him the information that he prepared in that exhibit, number -- Let me find it here.

A. Exhibit 6.

Q. Did he -- Did Craig ever tell you that Tom participated in giving him that information?

A. I don't remember what Craig told me. I received this via E-mail from Craig.

Q. And did you see where Mr. Norvanis said that Craig doesn't remember signing that document?

A. No. I'm not aware that Craig said that.

Q. Did you see in Mr. Norvanis's report that he said that Mr. Dobosz had not signed the physical demand analysis?

A. Are you asking me if I've seen it in here?

signed.

Q. Does he say in his final report as a representative, as an investigator for the United States government EEOC Division, Department say --

MR. GARRAUX: Object. It assumes something not in evidence. This isn't a final report. There's no final report for this. It's his investigation notes.

BY MR. LAYER:

Q. Okay. The investigation report of Mr. Norvanis dated September 18th, 2014, "I further noted that the physical demand analysis was not signed by Dobosz, Hladik or anyone else with the company."

Isn't that what that says?

A. That is what Mr. Norvanis's report states, yes.

Q. And isn't it a fact that you have not been able to provide me with that document signed -- signed by anyone?

A. Define "signed."

Q. Signed, handwritten signature.

A. The exhibits you provided do not have a signature, correct.

Q. Okay. And whose contention is it that Dobosz authorized his computerized signature?

MR. GARRAUX: I'm going to object. It assumes

A.   That's correct.

(Carter Exhibit No. 13 marked as requested.)

BY MR. LAYER:

Q.   I assume you've seen that before?

A.   I don't recall seeing this before, no.

Q.   Okay.  Well, I'll represent to you that this may be the final determination by the U.S. Equal Employment Opportunity Commission, Indianapolis Office.  Look at the one, two, three, fourth paragraph.  Read that out loud, please.

A.   Starts with "the evidence"?

Q.   Yeah.

A.   "The evidence obtained during the investigation revealed that the charging party was discharged due to his disability, no finding made on any other issues that were raised by this charge."

Q.   Did you on behalf or anyone that you know of outside of counsel, ever contact either Mr. Norvanis or more importantly, Webster N. Smith as the District Director of the EEOC to ask them why they determined that Quaker violated the Americans with Disabilities Act regarding their termination of Mr. Dobosz?

A.   I did not reach out to anybody, no.

Q.   And do you know of anyone other than counsel