# EXHIBIT "3"

STATE OF INDIANA ) )
                           ) SS
COUNTY OF MARION )

## ATTESTATION

I, Webster N. Smith, Director of the Indianapolis District Office of the Equal

Employment Opportunity Commission ("EEOC"), being duly sworn, and under oath, hereby

certify:

That, as the Director, all administrative files in the Indianapolis District Office were

under my care and custody on April 7, 2016;

That an administrative file was prepared in the regular course of business of the

Indianapolis District Office of the EEOC on Charge No 470-2013-01364 where as, Thomas

Dobosz alleges that Quaker Chemical committed an unlawful employment practice in violation

of the Americans with Disabilities Act of 1990, as amended; and under the Age Discrimination

in Employment Act;

That the documents attached hereto numbered 1 through 213 are true and accurate

copies of the documents from the administrative file of EEOC charge number No 470-2013-

03364, Thomas Dobosz v. Quaker Chemical.

*Webster N Smith*

WEBSTER N. SMITH
District Director

STATE OF INDIANA )
                           ) SS
COUNTY OF MARION )

LECTRIC L. CHANDLER
Notary Public, State of Indiana
Marion County
My Commission Expires
November 30, 2023

Before me the undersigned, a Notary Public for Marion County, State of Indiana,
personally appeared Webster N. Smith and he being first duly sworn upon his oath, says that the
facts alleged in the foregoing certification are true. Signed and sealed this 7th day of April,
2016.

*Lectric A. Chandle*

Lectric L. Chandler
Notary Public

My Commission Expires: November 30, 2023
County of Record: Marion



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Indianapolis District Office**

101 West Ohio Street, Suite 1900
Indianapolis, IN  46204-4203
National Contact Center:  (800) 669-4000
National Contact Center TTY:  (800) 669-6820
Indianapolis Status Line:  (866) 408-8075
Indianapolis Direct Dial:  (317) 226-5669
TTY (317) 226-5162
FAX (317) 226-7953 & 5571

## SEP 1 8 2014

Thomas Dobosz                              Charge Number: 470-2013-03364
4322 Hanbury Drive
Chapel. FL 3345-5202                        Charging Party


Quaker Chemical
3001 Dickey Road
East Chicago, IN 46312                      Respondent


## DETERMINATION


Under the authority vested in my by the Commission's Procedural Regulations. I issue, on behalf of the Commission, the following determination as to the merits of the subject charge.

Respondent is an employer within the meaning of the Americans with Disabilities Act, as amended (ADA) and the Age Discrimination in Employment Act. The timeliness and all other requirements for coverage have been met.

The Charging Party alleged that Respondent terminated his employment due to his disability and age.

The evidence obtained during the investigation revealed that Charging Party was discharged due to his disability. No finding is made as to any other issues that were raised by this charge.

The ADA requires that if the Commission determines that there is reason to believe that violations have occurred, it shall endeavor to eliminate the unlawful employment practices by informal methods of conference, conciliation and persuasion. Having determined that there is reason to believe that violations have occurred. the Commission now invites the parties to join with it in a collective effort toward a just resolution of this matter.

A representative of this office will be in contact with the parties in the near future to begin the conciliation process. When the Respondent declines to enter into conciliation discussions or when the Commission's representative for any other reason in unable to secure a conciliation

11



agreement acceptable to the District Director, the Director will so inform the parties in writing and advise them of the court enforcement alternatives available to the Commission and the Charging Party .

On Behalf of the Commission:

Webster N. Smith
District Director

cc:     David J. Garraux
        Fox Rothschild LLP
        625 Liverty Ave. 29th Fl.
        Pittsburgh, PA 15222-3115

12

On-Site Memo
CP: Thomas Dobosz
R: Quaker Chemical
From: Samuel Norvanis  *A/M*
3/26/14

Earlier today, I visited the ArcelorMittal facility in East Chicago, Indiana. I requested an on-site to tour the facility to view the work that CP performed during his employment and to interview witnesses. During the tour, I was accompanied by David Garraux (R's Attorney), Michelle Carter (R's Human Resources Manager, Craig Hladik (CP's former manager), Brad Wellensiek (CP's former supervisor), Douglas Walker (Legal Counsel for ArcelorMittal), Stephen Scott (the person who replaced CP) and Prunima Sethi (The Lab Support Representative for Mr. Scott). The on-site began with a plant tour of CP's work area. Prior to entering the work area, I received safety training and was required to wear protective eyewear, ear plugs and a hard hat. I was required to provide my own leather boots. There was nothing provided during the safety training that appeared to conflict with medical restrictions CP had in place at the time of his termination. The tour began with the safety training and we then proceeded to the plant and visited each work area CP was responsible for monitoring. Stephen Scott was a temporary employee that R brought on to replace CP. Mr. Scott led the tour of the work area. There is a considerable amount of walking required of the position. This was noted by Mr. Scott. Mr. Scott stated that he occasionally utilized his car to travel to different parts of the facility. Mr. Scott noted that there are times that he is unable to use his car and has to walk to each of the areas that he is responsible for monitoring. Mr. Scott's job consists of monitoring fluid levels of various tanks. Mr. Scott orders product as needed to refill the tanks. He is also responsible for gathering samples of various liquids. Mr. Scott conducts testing on some samples and mails out other samples for analysis. Mr. Scott stated that most samples are about a quart in size. Mr. Scott is required to up and down stair cases to access many of the tanks he monitors. In some instances, he is required to climb a ladder to access the top of the tank and uses a stick to measure the quantity of material in the tank. Mr. Scott uses the measurements in determining when to order material and the amount of material to order. The sampling of the liquid material as described by Mr. Scott does not appear to exceed the medical restrictions CP had at the time of his termination. Mr. Scott also obtains steel samples that he has to carry to R's lab (work trailer). Mr. Scott stated that the samples vary in weight, but the size is usually 18" by 36." Scott stated that the weight of the steel sample varied, but he would usually carry several samples at a time. He explained that if they were too heavy he would only carry one sample. At the end of my on-site visit, a sample was brought in for me to examine. I was told that it was a sample of one of the heavier products. I was able to pick the sample up by pinching it between my thumb and forefinger of one hand. R did not offer to weigh the sample, but I estimate that it was around ten pounds. During the on-site tour, Mr. Hladik stated that the samples weighed in excess of 35 pounds each. As noted, the sample brought in for examination weighed less. Mr. Hladik asked if there were heavier samples that have been run and he was advised that the sample brought in was from the heavier stock being produced at this location. During the tour, I was shown a number of portable tanks referred to as "totes." I was advised by Mr. Scott that these tanks were manually filled by him climbing up on the tank and placing the fill hose in the tank. I was shown a short hose, on another tank, that was allegedly the same diameter that was used for filling the totes. The hose appeared to be a reinforced rubber approximately 2 to 2 ½ inches in diameter. Mr. Hladik stated that hose would weigh in excess of fifty pounds when charged by the fill truck. R did not have a fill truck at the facility to allow me the opportunity to handle a fully charged hose. Mr. Scott stated that the totes are refilled once a month on average. Mr. Wellensiek commented during the tour that CP had injured himself by hitting his head on a low handing steel support in the basement area where were touring. I asked Wellensiek how tall was

126

CP and he stated that he was shorter than me (I am approximately 5" 10" tall). I had to duck in a few places to avoid hitting my head on low hanging supports. During our tour of the lab area, in the work trailer, Mr. Hladik commented that Mr. Scott has to restock boxes of chemicals used during the testing process and these could weigh in excess of 35 pounds (Reference the notes for Mr. Scott's interview for additional details).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

After the tour, I began the witness interviews. I first interviewed Stephen Scott. Prunima Stehi, Lab Support Field Representative, did not attend the interview. Since Mr. Scott was a non management witness, I had a one on one interview with him.

Mr. Scott is the individual that R brought in to replace CP. Mr. Scott stated that he currently works for Lab Support Agency. Lab Support has been Scott's employer for the duration of his employment at R's ArcelorMittal, Indiana facility. He began working at R's facility in October 2012. Mr. Scott stated that his job title is Site Engineer. Scott stated that he has never worked with CP. Mr. Scott met CP once when he came to the mill. Scott stated that CP was at the mill and stated that he was grabbing some of his stuff. Scott does not know if CP was still working for R at this point, but he had a pass to get into the mill. Scott stated that CP introduced himself and asked about him. Mr. Scott believes he will eventually be hired by R. Scott stated that it is his understanding that R brings individuals on as temporary employees before extending them an offer of employment.

I asked Mr. Scott who was responsible for showing him how to do his job. Mr. Scott stated that Brad Wellensiek, supervisor, and his other boss Shawn Rue. Scott stated that Brad showed him how to perform most of the duties of his position. Scott stated that CP did not perform any of the training received he received.

I asked Mr. Scott what are the duties of his position. Scott stated that his job is a stop gap for the mill to supply the mill with oils, chemicals and solutions that are needed for the daily operation of the mill as well as performing chemical analysis and tests to make sure that the steel being produced isn't bad. Mr. Scott does not perform the ordering of materials, but he reports to his supervisor when product is needed. He takes samples of various solutions for testing, check tank levels of products and reports when additional product is needed. Mr. Scott assists with the delivery of the product. In some instances the delivery driver hooks the hose up to tank connections and in other instances Mr. Scott pulls hoses into place and fills portable supply tanks.

I asked Mr. Scott what is the hardest part of his job. Mr. Scott stated that the walking back and forth is the most difficult part. Scott stated that he might have a tuck come in and he must manage his time getting back and forth to perform his other duties. Scott stated that the climbing he has to do to measure product and pull samples is also tricky, especially when it is cold outside. Scott again stated that the climbing and walking back and forth in the mill is the most physically demanding part of the job.

I asked Mr. Scott about the lifting requirements of his job. Mr. Scott believes that the most he has to lift is 35 to 40 pounds. Mr. Scott stated that he isn't certain what the exact weight of the material he has to lift. Mr. Scott stated that a steel sample is about 25 pounds and sometime he has three samples to take to the lab for testing. Mr. Scott noted if the steel samples are too heavy to carry all at once, he will carry less and make additional trips. I asked about the frequency of carrying the steel samples. Scott stated that he has to do the surface testing of steel samples twice a month. I noticed during the tour that the

area where the steel samples are gathered is fairly close to lab. Scott stated that he has to carry chemical supplies for the lab two to three times a month and these weigh 20 to 25 pounds and occasionally up to 35 pounds.

In reviewing the job description in R's position statement, exhibit "D," Mr. Scott stated that he does not monitor and maintain coolant filters, washers, paint systems, air handling systems, etc., or sump changes. He stated that this is done by ArcelorMittal Maintenance staff. Shawn Rue told Mr. Scott to report anything that is broken to Mittal. Mr. Scott does not maintain tools and utility equipment such as pumps, sump sucker, or coolant dispensers. Scott does not perform filter changes. He does not know what a "gon" is. He does not perform sump cleaning. Mr. Scott stated that he performs the other duties listed on the job description.

Mr. Scott denies being asked by R's staff what duties he performs and how he performs the duties.

Mr. Scott denied receiving help in performing his duties. However, he does received limited help from the mill staff to off load supplies from delivery trucks, but his isn't very often.

Mr. Scott stated after he was trained his duties have not changed. Mr. Scott stated that he was completely trained in a month and a half to two months.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Interview with Michelle Carter, Human Resources Manager since July 23, 2012. Respondent's attorney, David Garraux was present for this interview.

Ms. Carter stated that she was hired by R to work as their Human Resources Manager. She admits to having a role in terminating CP's employment. She was responsible for sending CP his termination letter. Carter stated that CP was out on disability leave when she started working for Quaker. Carter stated that she and Craig Hladik were reviewing CP's disability absence when the time came to evaluate the future of CP's employment. Carter stated that the "Total Disability Evaluation," in June 2013, was the tickler that began the consideration of CP's future employment with R. Ms. Carter stated that CP's removal stemmed from receiving the finial medical evaluation. Ms. Carter was responsible for initiating the decision to remove CP. She had to sign the termination letter, but it was reviewed by Timothy Hanes, Director of Global Human Resources and R's counsel.

Ms. Carter referred to the termination letter as a letter of notification. Carter stated that the letter contained language that asks CP to indentify work he could perform. Carter emphasized that CP had not been in contact with them for a considerable period and she only spoke to him twice. I asked Ms. Carter if CP was under any obligation to communicate with her or the company during his absence. Ms. Carter stated, no, but she again mentioned that they had not heard from him. Ms. Carter stated after the termination letter was sent to CP that she didn't hear from CP until a day or two before the 30 day period was up. Prior to the termination letter, the last verbal communication Carter had with CP was in April 2013. She heard from CP a couple of days before his termination date of September 5, 2013. CP called Carter and asked about his final payout, personnel file, and what benefits he would be receiving. Carter stated that CP did not advise her that he was capable of performing the duties of his position and he did not identify any other positions that he was capable of performing.

128

Ms. Carter denied hearing from CP other than mentioned above. I confronted her with CP's phone log and the dates he called her. She stated that she was in Candida and that she would have forwarded her phone. She denied speaking to CP or receiving any phone messages from him.

Ms. Carter stated that Mr. Hanes is the only other individual involved in the termination decision. Ms. Carter stated that Mr. Hanes was a participant in the discussion to terminate CP's employment. I asked Ms. Carter if she was responsible for making the decision that CP couldn't perform the duties of his position. Ms. Carter answered, "no;" she stated that it was the medical personnel who evaluated CP. I asked if it was the physician and she said, yeah.

Ms. Carter stated that CP's termination letter was a form letter with the exception of a few sentences that detailed the reason for termination. She authored the sentences that detailed the reason for CP's termination. The final letter was reviewed by Mr. Haynes and outside legal counsel. Ms. Carter stated that all termination letters are reviewed by Mr. Hanes and outside legal counsel.

Ms. Carter denied having a conversation with CP as to whether he could perform his job, with or without reasonable accommodation. I asked why not, she stated that we hadn't had any contact with him and he didn't call to discuss it with them.

Ms. Carter stated did not discuss CP's medical situation with CP nor did she have a discussion with the physician who treated CP. She made her termination decision based on the documentation received from the treating physician that stated CP had reached maximum medical improvement. The documentation reflected that CP could not perform the duties listed on his job description. Ms. Carter denied discussing CP's termination with CP's supervisor(s). Ms. Carter stated that R's risk management would have been the ones who discussed CP's treatment with CP's physician and medical personnel and they would have been the ones to discuss the duties of CP's position. She relied solely on the April medical report and the physical demand analysis. Carter stated that she did not have any interaction with the physician that conducted the physical demand analysis. She stated that Mr. Hanes would not have had either. Ms. Carter stated that R's risk management personnel provided the physician with the information used in conducting the physical demand analysis.

Ms. Carter had not toured CP's worksite period to today's on-site. She does not know who was responsible for developing the job description in exhibit "D" of R's position statement. Ms. Carter stated that she relied on the Service Level Agreement with ArcelorMittal and the Physical Demand Analysis in determining that CP couldn't do the job. Mr. Garraux stated that R has not provided the Commission with a copy of the Service Level Agreement. Garraux stated that he would send us a copy of the Service Level Agreement R has with Mittal.

Ms. Carter stated that she reviewed R's PS prior to it being sent to the EEOC and she feels that it is accurate. Upon Mr. Garraux comment, Ms. Carter stated that she provided further clarification to the position statement prior to its production to the EEOC.

*********************************************************************************************

129

Interview with Craig Hladik. He began working for R in 2001 as a Site Manager. He initially was a steel mill consultant for R and they eventually hired him. He is currently the Director of Operations, North America. He was the Regional Business Manager during CP's employment.

Mr. Hladik stated that he was involved in the decision to terminate CP's employment. He was responsible in analyzing the job scope and deciding whether CP could continue working for R. He stated that Human Resources also involved in making the decision. He stated that he interacted with Michelle Carter and Tim Hanes. Craig stated that his involvement with Carter and Haynes was putting all the facts on the table and deciding what they needed to do. Craig stated that there were about a half dozen conversations once CP received his final restrictions before he was discharged. He believes that risk management may have been involved. Craig stated that CP's job was a one person job given the requirements of the account and they did not see how CP could do the job on his own.

Craig stated that he was involved in going over the check sheet with CP concerning the physical demand requirements of the position and that CP check and agreed with the report. Craig stated that he is familiar with the job performed by CP because he had actually done this type of work earlier in his career. Craig stated at the time of CP's physical demand analysis, he couldn't wear a hard hat, could not perform over head with his arms and couldn't lift over 35 pounds. Craig stated that with these restrictions, CP couldn't climb ladders to gather samples, lift a five gallon bucket to pour chemical into tanks. Craig stated that pulling the hose needed to fill portable tanks weighed more than 35 pounds. He denied measuring the hose weight, but based the weight on his experience doing the job. He stated that the chemicals used for testing and adding to storage bins could weigh up to 12 pounds per gallon and these were carried in five gallon buckets.

I asked Craig if anyone in management asked him to identify the duties performed by CP. He stated that he compiled the document attached as exhibit C to R's position statement. Craig stated that Michelle Carter asked him to compile the Physical Demand Analysis in Exhibit "C." Craig does not recall if he had CP sign or initial the document. The document in exhibit C only has Craig and CP's names typed on it. Craig denied knowing if he had a signed or initialed copy from CP. According to Craig, this document was given to CP's physician to assess CP's ability to perform the job.

Craig stated that he did not have a discussion with CP once he was given his permanent restrictions on June 24, 2013. Craig stated that he was no longer CP's supervisor at this time. Craig supervision of CP ended in April or May 2013 when he became director of operations for the corporation. Craig stated that CP did not attempt to speak to him once R notified CP that he was going to be terminated.

**************************************************************************************************

Interview with Brad Wellensiek is a product manager. He held the same position during CP's employment and obtained the title in 2008. Wellensiek denied participating in the decision to terminate CP's employment. He was asked by Craig Hladik what duties CP performed, like climbing a ladder. He stated that he was asked for this information well over a year ago. Wellensiek performed CP's duties by obtaining information from CP and Shawn Rue, Process Engineer. Brad stated that he filled in while CP was off and he basically did what Shawn asked him to do. He stated that Shawn did not perform any of CP's duties.

I asked what he knows of the duties performed by CP. Wellensiek was basically what we observed in the on-site tour today. In reviewing exhibit D, Brad denied performing work to maintain coolant filters, but stated that they visually look at the filters. He denied that R maintained equipment such as pumps, sump sucker, coolant dispensers at the Mittal facility. I asked if it was ArcelorMittal's responsibility to perform and he said as far as he knows it is because if it belongs to the mill, we don't touch it.

He learned of CP's termination after CP had been let go. He was told by Shawn Rue that CP was let go because he couldn't to his job of climbing ladders and he couldn't lift over ten pounds. He does not know who was responsible for terminating CP.

Mr. Wellensiek performed CP duties after he was injured until the temporary employee was brought in about October 2013. He guessed it was October. Wellensiek stated that the temporary employee performs all the duties once performed by CP. Wellensiek performs the duties when the temporary employee is on vacation. Mr. Scott is the only temporary employee R has used to fill CP's position. He claims that the duties of CP's job have not changed. He noted that Mittal has placed stairs to access one of the tanks that used to be access by ladders. He does not know why stairs were installed on the tank. He does not know if R has made any requests of Mittal to make any changes to make it easier for R to perform their work for Mittal.

He has not had any discussion with CP after CP's termination.

He considers carrying the steel samples to and from the trailer to be the more strenuous part of CP's former job. Wellensiek stated that this is the most strenuous because of their weight and size. When Wellensiek performed CP's job, he had to carry two steel samples per week. Wellensiek stated that filling the totes is difficult as well. Wellensiek stated that there is no filling apparatus for the totes. Hose weighs at least fifty pounds to fill the totes. The Totes are filled at least once a month.

I asked about the duties on the other side of the plant (East side). Wellensiek stated that there are two employees, Mat Ferree and Mr. Shaw working at the end of the facility. Wellensiek stated that there are two employees at the other side because there is more work. However, one of the employees primarily performs wet testing and the other performs the other work that we saw at the West side during the on-site tour. The employees working at this facility for R are not Union. Wellensiek stated that the there are more bulk tanks at the other side of the plant and the delivery driver or Mittal employee usually connect the hoses to the tanks. The individuals at the other plant have been with R since 2009. Brad stated that R has not hired anyone at the Mittal facility since CP's termination and only used Mr. Scott, a temporary employee, to replace CP. I asked why Mr. Scott was a temp instead of a R employee. Brad stated that we bring everyone in as a temp at first, but he doesn't know why Mr. Scott has not been hired.

131

PDI with R's Attorney, David J. Garraux
CP: Thomas Dobosz
R: Quaker Chemical
From: Samuel Norvanis
9/18/14

I contacted Mr. Garraux to conduct a PDI with respect to CP's charge. I asked Mr. Garraux if he had any additional evidence that he or R intended to send prior to the Commission issuing its final determination. Mr. Garraux asked if I had received his May 7, 2014 correspondence. I confirmed receipt of the correspondence. Mr. Garraux stated that he did not have any further information to provide.

I advised Mr. Garraux that with respect to the Age complaint filed by CP that we were unable to determine that a violation of the ADEA occurred. However, I informed Mr. Garraux that the evidence supported CP's allegation that he had been discharged due to his disability. I explained that the decision was based on the evidence obtained from R, CP and during the on-site investigation. I explained that R's position statement overstated the duties of the position. I explained that the witness testimony clearly demonstrated that the position description was not accurate for CP's position, particularly the physical demands. I noted that in conducting the tour of CP's position that the job mainly consisted of walking and CP was not restricted in this area. Garraux stated, "What about the 80 pound fill hoses." I advised Mr. Garraux that no one stipulated that the fill hoses weight this much. I noted that Mr. Hladik stated that the hose exceed the 30 pound weight restriction when it was charged. I explained that CP noted that the delivery driver assisted him when filling the portable tank by handing him the fill hose. I noted that during the on-site Mr. Hladik stated that CP would have to climb up on the tank carrying the hose. Mr. Garraux did not concede that CP had assistance from the delivery driver.

I noted that Ms. Carter's testimony was also troublesome. She noted during the on-site interview that she and Mr. Hanes made the decision to terminate CP. She stated that he relied on the Service Level Agreement and the Physical Demand Analysis in determining that CP could not perform the duties of his position. I pointed out that he supplied me with a copy of the Service Level Agreement. I explained that there was no information on the Service Level Agreement reflecting the physical demands. I further noted that the Physical Demand Analysis was not signed by CP, Mr. Hladik or anyone else with the company. I noted that CP disputes that he had to do any lifting in excess of his restrictions. I further noted that CP had provided evidence that he had restrictions from an earlier injury that restricted him to lifting 35 pounds and restricted him from climbing ladders, but R allowed him to work. I also noted that Ms. Carter stated that she had never toured CP's work area or spoke to the company physician about CP's abilities prior to making the decision to terminate his employment.

Mr. Garraux then shifted his rebuttal to pointing out the CP relocated his residence to Florida. Mr. Garraux stated that this is proof that CP never intended to continue working for R and that we should dismiss CP's charge. I advised Mr. Garraux that CP's change of residence occurred after he was discharged by R. This issue does not negate the fact that R terminated CP due to his disability. Mr. Garraux argued the CP committed tax fraud. I advised Mr. Garraux that tax regulations are outside our statutory authority.

I advised Mr. Garraux that he will be receiving the LOD in the near future. I explained that I will be handling the conciliation phase of the administrative process. Mr. Garraux stated that he is familiar with the process.

# EXHIBIT "4"



**APAC GROUPE**
CENTERS *for* PAIN MANAGEMENT

*...& Psychological Treatment For Acute, Chronic & Cancer Pain*

**NAME:**    THOMAS E. DOBOSZ          **DOCTOR:**    TAHA JAMIL, M.D.

**DOB:**    11/22/1948                **LOCATION:**   CROWN POINT

## PARTIAL PERMANENT IMPAIRMENT

**DATE OF VISIT:** 09/25/06

**HISTORY:** Mr. Dobosz is a 57-year-old gentleman with a history of axial neck pain secondary to a work-related injury in September of 2005. He was bent over, stood up, and the top of his head hit a beam. He was wearing a helmet at the time. Nonetheless, he had sudden, sharp pain in his neck. He has tried various treatments in the past; he went for physical therapy which did not help him.

He saw Dr. Kucharzyk who then sent him for some traction; he thought this made the symptoms worse. He also tried massage that did not cause any change in his symptoms. He was then seen by Dr. King who initially performed an epidural steroid injection that provided no relief. He then tried a medial branch block and then radiofrequency neural ablation of the right cervical facet joints, and this did help his symptoms. He had the left side done in July of 2006 which made his symptoms worse.

He continues to take anti-inflammatory medications that he says help him somewhat. His pain is constant, severe, and localized to the neck. It is worse with activity and alleviated with rest. He denies any numbness, tingling, or weakness in his arms.

**PAST MEDICAL HISTORY:** His past medical history is significant only for high blood pressure.

**CURRENT MEDICATIONS:** Flexeril, Voltaren, and Cymbalta. He tried Lidoderm in the past but did not think this helped him. Additionally, he reports some difficulty reading with his bifocals. He says bending his neck down seems to cause more pain.

**PHYSICAL EXAMINATION:**

General:        On physical exam Mr. Dobosz is seated in a chair. He is pleasant, cooperative, and does not appear to be in any obvious distress.

Back/Spine:    He has tenderness to palpation over the spinous processes and the paraspinal muscles in the cervical region diffusely. Range of motion is slightly limited in flexion and extension. Forward flexion is 40% and extension is 50%. Rotation is 45 degrees to the right and 35 degrees to the left. Shoulder range of motion is full and within normal limits and pain free.

Extremities:    Manual muscle testing reveals 5/5 strength in the bilateral upper limbs in all muscle groups. Sensation is intact to light touch in all dermatomes, and muscle stretch reflexes are 2+ in the biceps, triceps, and wrist flexors. Hoffmann sign is negative bilaterally.

I did review the functional capacity evaluation dated 09/08/06. I see there is significant limitation to elevated work that is weighted. Otherwise, in terms of his posture and ambulation there are no significant limitations. I note that he has to frequently shift his weight. One thing I find interesting is that he gets shaking of his arms during push-pull test as well as overhead, elevated work. The other limitation was that he is unable to climb

(1)

"Our mission is to provide the most advanced, compassionate care to patients in pain."
E. 86th Ave. Suite O Merrillville, IN, 46410-6236
For patient referrals, please call 1-219-756-2722

Please refer to www.apacgroupe.com for a complete list of all of our locations



APAC GROUPE
CENTERS for PAIN MANAGEMENT

*Medical, Physical & Psychological Treatment For Acute, Chronic & Cancer Pain*

| | | | |
|---|---|---|---|
| **NAME:** | THOMAS E. DOBOSZ | **DOCTOR:** | TAHA JAMIL, M.D. |
| **DOB:** | 11/22/1948 | **LOCATION:** | CROWN POINT |

## PARTIAL PERMANENT IMPAIRMENT

September 25, 2006

vertical because of the inability to lift his body weight onto a platform from a ladder. He also has some limitations with his grip strength. The report suggests light-medium U.S. Department of Labor physical demand level.

Looking at table 15-14 in *The AMA Guidelines to Evaluation of Permanent Impairment*, there is some limitation with range of motion in the cervical spine, particularly with rotation. The limited rotation to the left puts an impairment of roughly 3% and to the right 1%. These totaled to a 4% impairment of the whole person.

Taha Jamil, M.D.
TJ/CB

cc:    Christine Stiller, C.M.
      Fax: (603) 334-8089

(2)

"Our Mission...is to provide the most advanced, compassionate care to patients in pain."
521 E. 86th Ave. Suite O Merrillville, IN, 46410-6236
For patient referrals, please call 1-219-756-2722

Please refer to www.apacgroupe.com for a complete list of all of our locations

# EXHIBIT "5"

USDC IN/ND case 2:15-cv-00203-PRC   document 24-4   filed 04/22/16   page 3 of 4

𝟽𝟹𝟿𝟹𝟹

| AGREEMENT TO COMPENSATION OF EMPLOYEE AND EMPLOYER State Form 1043 (R/5-88) | INDIANA WORKER'S COMPENSATION BOARD Room 601 State Office Building 100 North Senate Avenue Indianapolis IN 46204 | File Number WC161-594246 |

PRIVACY NOTICE: This agency is requesting disclosure of employee's social security number in accordance with IC 22-3-4-13

| (Please check appropriate box) | ☐ Temporary Total Disability (TTD) ☐ Temporary Partial Disability (PTD) | ☒ Permanent Partial Impairment (PPI) ☐ Permanent Total Disability (PTD) | |
|---|---|---|---|
| Employer's Federal I.D. Number **REDACTED** | Name of Employer Quaker Chemical Corporation | | Telephone Number (610) 832-4154 |

Address (Street, number, city, state and ZIP code
One Quaker Park, 901 Hector Street, Conshohocken, PA 19428

| Employee's Social Security Number ██████ | Name of Employee Thomas E. Dobosz | Telephone Number ██████ |

Address (Street, number, city, state and ZIP code
██████

We (employee and employer) have reached an agreement in regards to compensation for the injury sustained by said employee and submit the following statement of facts relative thereto.

| Date of Injury / Illness / Exposure: 9/23/2005 | Nature of Injury / Illness / Exposure Neck pain - non-surgical. |
|---|---|
| Date Disability began. | |

Place of Injury / Illness / Exposure:
East Chicago, IN

Cause of Injury / Illness / Exposure:
Stepping through a lowered doorway and struck head (helmet) on the crossbar causing neck and shoulder pain.

Probable Length of Disability

The terms of this agreement under the above facts are as follows:

That _____ Shall receive compensation at the rate of $ _____

per week based upon an average weekly wage of $ _____ and that said compensation shall be

payable (i.e. weekly or biweekly) _____ until terminated in accordance with the provisions of the Indiana

Worker's Compensation / Occupational Diseases Acts.

"A person who knowingly and with intent to defraud an insurer files a statement of claim containing false, incomplete, or misleading information commits a felony"

If PPI settlement, please provide impairment rating, number of weeks and amount to be paid
AWW $815.49   TTD $543.66

4% x 100 degrees = 4 degrees x $1300 per degree = $5200.00

# of weeks = 9.565 = from 09/23/05 through 11/29/05.

**SIGNATURES**

| Signature of Employee | |
|---|---|
| Signature of Employer | |

| Name of Insurance Carrier Wausau Insurance Company | Telephone Number (317) 469-1442 | APPROVED FOR USE ONLY WORKER'S COMPENSATION BOARD OF INDIANA |
|---|---|---|
| Address (Street and number) P O Box 1187 | | |
| City, state and ZIP code Indianapolis IN    46206 | | DEC 1 1 2006 |
| Authorized Signature and Title ~~Senior Case Manager /~~   CCM III | | |
| Date of Agreement 12/6/06 | | MEMBER |

13-CSF-5 F1

DEFS000017

I, the undersigned, who was injured on _____September 23, 2005_____, while in
                                                              (Date)                                    the
employ of ___Quaker Chemical Corporation_____

understand the provisions of rule No. 30 of the Industrial Board Rules of procedure as follows:

> "Rule No. 30.    Compensation agreements in all cases of
> amputations, permanent impairment or permanent partial im-
> pairment shall have attached thereto when filed with the
> Industrial Board a report of a physician furnished by the
> employer and also a report of a physician employed by and
> representing the employee unless such report is waived in
> writing by such employee as to such amputation or their
> opinions of percent of permanent impairment or permanent
> partial impairment unless such reports have been previously
> filed. When so filed, such agreement will be approved or set
> down for hearing in the discretion of the Industrial Board"

I understand it is the opinion of the employer's physician        ___Taha Jamil M D_____
                                                                                    (Name)
that my injury has resulted in permanent partial impairment of the          Whole Person

of  _4.0___ % and I am fully satisfied to accept that estimate of my permanent partial impairment and to

waive my right to examination by a physician of my own selection as to the extent of such permanent

partial impairment.

_____
                        (Signed)

"A person who knowlingly and with intent to defraud an
insurer files a statement of claim containing any false,
incomplete, or misleading information commits a felony."

WITNESS

_____

13 CSF-2 R1

DEFS000018

# EXHIBIT "6"



**Health RESOURCES℠**

An AllOne Company

January 27, 2009

Mr. Thomas Dobosz
102 Potomac Dr.
Dyer, IN 46311

Dear Mr. Dobosz:

You were examined on 12/8/2008 for Quaker Chemical to determine your general state of health and suitability to perform your job function.

This was done in accordance with current OSHA regulations. You have also been evaluated with respect to wearing respiratory protection.

Your results are listed below:

- Your physical exam was normal except for symptoms related to a neck injury in 2005.

- Lung function test results were outside of expected values. Testing indicates a borderline obstruction.

- Your hearing test was within normal limits. You should always utilize hearing protection when exposed to loud environments.

- A Chest x-ray was not performed.

- You are cleared to wear a respirator. However, discontinue respirator use if you are experiencing wheezing or shortness of breath.

- You are medically cleared with the following restrictions: No lifting over 35 lbs.; no climbing ladders.

I wish you continued good health. Feel free to call me with any questions you may have.

Sincerely,

Reviewing Physician

111571

EXHIBIT
Carter
2
2 13/14

# EXHIBIT "7"

Mentillville Legal/DABB
Claim No: _____
Document Type:
Medical ___ Litigation ___ Other _____
**DO NOT SEPARATE/SCAN AS ONE DOCUMENT**

## BEFORE THE INDIANA WORKER'S COMPENSATION BOARD

| | |
|---|---|
| THOMAS DOBOSZ, | ) |
| Plaintiff, | ) |
| | ) DATE OF INJURY: April 20, 2012 |
| v. | ) |
| QUAKER CHEMICAL CORPORATION, | ) |
| Defendant. | ) |

## COMPROMISE SETTLEMENT AGREEMENT

### I. SETTLEMENT AGREEMENT

COMES NOW Plaintiff, Thomas E. Dobosz, of his own volition, in person and without counsel and comes also Defendant, Quaker Chemical Corporation, by counsel, Jane R. Callies and enter into this Agreement.

1. That the parties agree that the Worker's Compensation Board of Indiana has jurisdiction of said claim and said Board may take such further action as is necessary to carry out the provisions of this Compromise Settlement Agreement at the Indianapolis offices of said Board and without further notice to the parties hereto, which notice is hereby respectively waived.

2. That the Parties agree that any Order of the Worker's Compensation Board of Indiana approving the terms of this Agreement shall constitute an approval of this Compromise Settlement Agreement and waiver by Plaintiff of any worker's compensation rights and benefits Plaintiff may hereafter have, arising out of this injury, under the Laws of any State.

3. Plaintiff knows and acknowledges that he has the right to seek the advice of an attorney before entering into this agreement.

4. That Plaintiff was an employee of the Defendant on April 20, 2012 at an average weekly wage of $1,081.31.



FILED

SEP 0 9 2013

Workers Compensation
Board of Indiana

SEP 1 3 2013



EXHIBIT
Dobosz
10
2/2/14

DEFS000193

5. That on or about said date, during the said employment, Plaintiff was injured by accident arising out of and in the course of employment with Quaker Chemical Corporation, where he slipped on a stair, which resulted in him landing on his buttock. He ultimately underwent a C4-5 fusion.

6. Plaintiff reached maximum medical improvement on or before June 24, 2013 with a Permanent Partial Impairment (PPI) of 7%, per Dr. Nikola Nenadovich. (See report attached as Exhibit A.)

7. Plaintiff alleges permanent injuries from the work-related accident.

8. Defendant disputes the extent of the injuries and the extent of any permanent injuries to Plaintiff.

9. By reason of the disputes set forth above, and with the knowledge of the uncertainty of the outcome of the litigation, and expense of continued litigation of said claims and the desire by the parties that their differences be resolved and a willingness on the part of Plaintiff to give up any workers compensation rights the Plaintiff may hereafter acquire in connection with the work injuries listed above, the parties have agreed that the Plaintiff's claim be compromised and settled at and for the lump sum of sixteen thousand eight hundred dollars and no cents ($16,800.00).

10. The Plaintiff hereby specifically waives and gives up all further worker's compensation rights the Plaintiff may have under the Laws of any state, arising out of this alleged employment related accident, and further agree that the approval by the Worker's Compensation Board of Indiana, carrying into effect the provisions of this Compromise Settlement Agreement, shall be deemed by the parties to constitute an approval of the settlement set forth herein.

11. The parties waive their right to appeal this cause or to have the same reviewed by the Full Worker's Compensation Board of Indiana pursuant to the Indiana Code and Rules of the

DEFS000194

Worker's Compensation Board of Indiana, upon issuance of an Award pursuant to the stipulation herein.

12. This Agreement is entered into by and between the parties solely to effectuate this Compromise Settlement Agreement and approval thereof by the Worker's Compensation Board of Indiana pursuant to I.C. 22-3-2-15 and this Agreement and this stipulation shall be of no force or effect in the absence of the entry of an order or Award authorizing and/or directing such settlement by the parties.

13. Plaintiff understands that if the Board approves this settlement, he will have no future claim to any benefits, compensation or medical payments from the Defendant or the Second Injury Fund in regard to this alleged employment related injury, regardless of whether there is a change of condition.

## II. MEDICARE SET-ASIDE AGREEMENT

14. Pursuant to 42 U.S.C. 1395y *et seq.*, 42 C.F.R. §411.20-§411.47, the Medicare Intermediary Manual and certain Memorandums or FAQ's issued by CMS, the parties acknowledge their duty to adequately consider Medicare's interest in this workers' compensation settlement by not shifting the health care burden of this claim to Medicare. The parties also recognize their duty to compensate Medicare for any conditional payments made by it. The parties have complied with their duties under the law in the following manner.

15. According to 42 C.F.R. §411.46, a lump-sum compromise settlement is a settlement that "forecloses the possibility of future payments of workers' compensation benefits." That regulation and MIM §3407.7 and MCM §2370.7 also provide that a lump-sum compromise settlement is a "settlement which provides less in total compensation than the individual would have received if the claim has not been compromised." *See* MIM §3407.1(E) and MCM §2370.1 for the definition of "lump-sum compromise settlement" as it is used in MIM §3407.7 and MCM §2307.7.

DEFS000195

16.    Thomas E. Dobosz is receiving less in total compensation than he would receive if this claim was not settled on a compromise and is foreclosing any future possibility of future medical payments. Therefore, by definition, this is a lump-sum compromise settlement.

17.    Thomas E. Dobosz suffered a cervical injury with right arm pain which has completely resolved. No future medical care is indicated. Medicare's interests have been considered and as no future medical care is necessary, no settlement funds have been set-aside for future medical care.

18.    In the April 22, 2003 CMS indicated the following:

It is unnecessary for the individual to establish a set-aside arrangement for Medicare

if all of the following are true:

a) The facts of the case demonstrate that the injured individual is only being compensated for past medical expenses (i.e., for services furnished prior to the settlement);

b) There is no evidence that the individual is attempting to maximize the other aspects of the settlement (e.g., the lost wages and disability portions of the settlement) to Medicare's detriment; and

c) The individual's treating physicians conclude (in writing) that to a reasonable degree to medical certainty the individual will no longer require any Medicare-covered treatments related to the WC injury.

The above cited law, regulations and CMS memo result in no need for the establishment of a

Medicare Set-Aside.

IN WITNESS WHEREOF, the Parties have executed this Compromise Settlement Agreement on this 5 day of SEPTEMBER, 2013.

By: _____
Thomas E. Dobosz, pro se, Plaintiff

DEFS000196

Quaker Chemical Corporation

· By:                             
Jane R. Callies, #21912-45A
Attorney for Defendant

DEFS000197

## WORKER'S COMPENSATION BOARD OF INDIANA APPROVAL

· The above and foregoing Compromise Settlement Agreement is hereby approved and made a part of the record herein this _10th_ day of _September_, 2013.

. WORKER'S COMPENSATION BOARD

_Linda Hamilton_

Chairman

Copies to:

JANE R. CALLIES
LAW OFFICES OF THE ·
LIBERTY MUTUAL GROUP
707 E. 80th Place, Suite 101
Merrillville, IN 46410

Thomas E. Dobosz

# EXHIBIT "8"

Michelle Newcomb LBJI                                    (9/9) 06/24/2013 11:25:02 AM -0500



**ORDER FORM**

06/24/2013

| Patient Name: | Dobosz, Thomas | Sex: | Male |
| Patient ID: | | DOB: | (b)(6)(b)(c) |
| Patient Phone: | | Primary Insura | Workers Comp |

**WORK STATUS REPORT**
Date: 6/24/2013
DIAGNOSIS: 722.0, 723.4, 723 1
VISIT TYPE. FOLLOW UP VISIT
DOI 04/20/12

ACTIVITY STATUS: PERMANENT RESTRICTIONS:: NO LIFTING, PUSHING PULLING > 30 LBS FREQUENTLY, > 30 LBS OCCASIONALLY NO OVERHEAD WORK.

YOUR EMPLOYER AND THE INSURANCE COMPANY REQUIRE THAT THE DOCTOR STATE WHAT YOUR WORK RESTRICTIONS ARE. IN OTHER WORDS, WHAT THE DOCTOR FEELS YOU CAN OR CANNOT DO AT WORK. IF THE EMPLOYER CANNOT ACCOMODATE THESE RESTRICTIONS, THEN YOU SHOULD BE CONSIDERED "OFF WORK."

RETURN TO CLINIC. ACCORDING TO THE AMA GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 6TH ED PAGE 564 TABLE 17-2 AND PAGE 575 TABLE 17-7 HE QUALIFIES FOR 7% PPI RATING RELEASED FROM CARE WITH THE ABOVE PERMANENT RESTRICTIONS
SPECIAL INSTRUCTIONS:

Nikola Nenadovich, MD
Lakeshore Bone & Joint Institute
cc:
enc:

Lakeshore Bone & Joint Institute - 601 Gateway Blvd., Chesterton, IN 46304
Phone (219) 921-1444          Fax (219) 921-5303

**Florence Larcamp - RE: Dobosz**

**From:** "Zychowicz, Joleen" <JOLEEN.ZYCHOWICZ@LibertyMutual.com>
**To:** 'Florence Larcamp' <larcampf@quakerchem.com>
**Date:** 6/27/2013 5:09 PM
**Subject:** RE: Dobosz

Hi Florence,

Mr. Dobosz's Permanent Partial Impairment (PPI) is worth $9800.00.

He has been released from care with permanent restrictions. He also will become Medicare eligible in November when he turns 65. So we will be required to take Medicare's interests into account with any settlement. That means a portion of the settlement will need to be set aside by the claimant for medical.

The claimant continued to complain of pain and stiffness, and also of swallowing issues. If he retained an attorney, they would likely send him for an evaluation of their own to option additional treatment requests and/or to get a higher PPI. They may also attempt to get a PPI for the swallowing issues.

Therefore I would like to attempt to settle this sooner than later. I would attempt a full and final settlement of all issues up to $20,000. My first offer would be $14,000, which is the PPI plus $4200.00.

Please review and let me know if Quaker Chemical is in agreement with the settlement strategy, and I will then contact the claimant with my first offer.

Please feel free to contact me with any questions or concerns.

Thank you,

JOLEEN SUE ZYCHOWICZ, AIC, AIS, ACS, SCLA | TECHNICAL CLAIMS SPECIALIST I
Liberty Mutual Insurance | Commercial Insurance Claims
(O) 800-826-1661 ext. 7372 | (F) 603-334-8503



This e-mail, and any attachments thereto, is intended only for the use of the addressee or addresses named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me via return e-mail and via telephone at 800-826-1661 extension 7372 and permanently delete the original and any copy of any e-mail and any printout thereof.

Please let my manager know how I am doing. Email: justin.stanke@libertymutual.com

file://D:\Profiles\larcampf\AppData\Local\Temp\XPgrpwise\51CC71E1QC6NA110017A7...    6/28/2013

DEFS000230

## Florence Larcamp - RE: Dobosz '.

| | |
|---|---|
| **From:** | Florence Larcamp |
| **To:** | Michelle Carter |
| **Date:** | 6/27/2013 11:24 AM |
| **Subject:** | RE: Dobosz '. |
| **Attachments:** | WC868A42004-Medical-MaximumMedicalImprovement-06_24_2013.pdf |

Michelle

I just wanted to make sure you had this. The claimant is at Maximum Medical Improvement. No further treatment. Permanent work restrictions of no lifting over 30lbs, no overhead work. Calculations are being worked on for the settlement with him. As soon as I hear from Liberty as to how we should proceed, I'll let you know.

Florence

*[handwritten notes]*

Settlement figure by @ Tuesday

Now we know let him go waxind

not impact settlement

6/28 pay through

Copy of letter to me for Liberty

P. # by Tuesday

DEFS000231

# EXHIBIT "9"

## Kitzman, Kristen L.

| | |
|---|---|
| **From:** | Michelle Carter <carterm@quakerchem.com> |
| **Sent:** | Tuesday, August 28, 2012 12:29 PM |
| **To:** | Tom Dobosz |
| **Subject:** | Work Restriction Follow Up |
| **Attachments:** | 20120828115415.pdf |

Tom,

After speaking with Florence we will need some additional documentation with regard to the limitation set in 2006.

According to Florence the details within the attached letter are used to calculate the settlement amount for the injury. Since the letter does not say there is a permanent restriction of this required repetitive motion of climbing a vertical ladder, and you have been doing it since returning to work from the previous claim, we will need documentation stating the current restriction of climbing vertical ladders and if that restriction is in fact permanent.

Based on review that documentation we will then determine next steps. Thanks for you cooperation in this matter.

Regards,

**Michelle Carter | HR Manager | Quaker Chemical Corp**
3431 Yankee Road  Middletown, OH 45044
Tel 513.424.3124 | Fax 513.433.0047         ✉ carterm@quakerchem.com

EXHIBIT
Carter
4
2/3/14

1

DEFS001168